J-A07032-19

2019 PA Super 116

| K.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| V. | : | |
| | : | |
| TERRENCE TINSLEY | : | |
| | : | |
| Appellant | : | |
| | : | No. 2883 EDA 2018 |

Appeal from the Order Entered July 16, 2018
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  1807V7160

BEFORE:   OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                    **FILED APRIL 15, 2019**

Appellant, Terrence Tinsley, appeals *pro se* from the July 16, 2018, order entered in the Court of Common Pleas of Philadelphia County granting the petition filed by his former paramour, K.B.,[1] under the Protection from Abuse ("PFA") Act.[2]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On July 11, 2018, K.B. filed a petition for a PFA order against Appellant wherein she accused Appellant of stalking her.  The trial court granted the petition and issued a temporary PFA order the same day.  On July 16, 2018, the trial court held a hearing on the matter.

_____

[1] We use the victim's initials to protect her identity.

[2] 23 Pa.C.S.A. §§ 6101-6122.

_____

*   Former Justice specially assigned to the Superior Court.

At the hearing, K.B. testified she and Appellant began dating in September of 2017, but they never lived together. N.T., 7/16/18, at 12-13. In May of 2018, she told Appellant that she no longer wanted to see or date him because he had become verbally abusive. *Id.* at 12, 20. K.B. indicated the "final straw" for the relationship was an incident when Appellant screamed at her, yelled at her, and in her presence used a butcher knife to cut an air mattress, which was located in her bedroom. *Id.* at 20. During the "butchering [of] the bed" incident, Appellant called her "a whore" and "a bitch." *Id.* at 21. K.B. was "scared to death" during the incident and came to the conclusion that Appellant "has a serious anger problem." *Id.*

K.B. indicated that, after she told Appellant the relationship was over, Appellant "wasn't having it. He continued to call [her] phone. He continued to come to [her] house. He started tracking [her] phone. He was coming to every place [where she] was[.]" *Id.* at 12. K.B. testified that Appellant seemed to be tracking her movements since, at least three times a week, he would arrive at her house just as she was leaving for work in the evening or arriving home in the morning. *Id.* at 13, 15. K.B. indicated that, as soon as she stepped out of her house, Appellant would "run[] up and start[] screaming and cussing and hollering in [her] face." *Id.* Appellant told K.B. that she "ruined [his] life," "[he] need[ed] to talk to [her]," and "[he] need[ed] to reason with [her]." *Id.* K.B. elaborated that Appellant's "behavior was out of control. He's screaming. He's yelling. He's cursing. He's carrying on." *Id.*

at 14. K.B. indicated that, in response to Appellant's behavior, she told him "it was over," she did not want not see him anymore, and she wanted him "to stop doing this." *Id.* at 15. K.B. testified she was alone when the confrontations occurred and, particularly during the evenings, she felt "[t]hreatened." *Id.* at 14.

K.B. testified that, in addition to confronting her, Appellant would leave notes on her door, he would call her at least two or three times a day, and neighbors had observed him propping her screen doors open apparently in an effort to convey that he had been there. *Id.* at 16. In one of the notes, Appellant told K.B. to answer her phone when he called, and in another note, he asked for a table. *Id.* at 16-17. K.B. testified that, after the relationship ended, Appellant "got back all of his stuff." *Id.* at 17.

K.B. testified that, since she filed the PFA petition, Appellant has not appeared at her house and, since she changed her phone number, he has not called her. *Id.* However, she presented the court with several text messages, which Appellant sent to her after the relationship ended. For instance, Appellant sent K.B. the following text messages in June of 2018:

> If I ever cut you off, understand and respect that you are toxic and never served a purpose in my life. I get tired of bullshit.
>
> ***
>
> Got results back. I'm good. Don't have to worry about hearing from me. We have no more ties.
>
> ***
>
> You did nothing wrong. And you're not just a fuck or trick. You are a woman who is trying to reach her goal. Let no man ever

- 3 -

have you question your value. Keep your head up. It's all on me. I fucked up, not you.

\*\*\*

I [k]now you are through with me. I need you to understand that you are the first woman I have been with in the last 25 years. Please give me time to get over this LT.

\*\*\*

Next time your friend get[s] in my business, he will regret it.

*Id.* at 27-28. K.B. did not respond to any of the text messages. *Id.* at 28.

K.B. testified that, after the relationship ended, there was one occasion when Appellant suddenly appeared in the parking lot as she was walking out of the gym. *Id.* at 19. Appellant approached her, and K.B. asked him to "please just leave." *Id.* Appellant grabbed her t-shirt in the upper chest area and pushed her back. *Id.* K.B. testified she was "terrified" when this happened. *Id.*

K.B. testified that she sought an order of protection from Appellant because he will not leave her alone. *Id.* at 23. As a result, she does not feel safe in her home, she can't sleep, she can't eat, and she feels threatened. *Id.*

Appellant testified he and K.B. did not "break up" in May of 2018; but rather, they ended the relationship on June 11, 2018. *Id.* at 32. He testified they ended the relationship the day he found out he tested negative for a sexually transmitted disease. *Id.* He explained that, after he tested negative, he sent one of the text messages to K.B. in an effort to apologize for being upset. *Id.*

- 4 -

Appellant indicated he left a note because he wanted his belongings back. *Id.* He testified he contacted the police to escort him to K.B.'s residence so that he could retrieve his belongings and, thereafter, he had no intention of ever bothering K.B. again. *Id.* at 31. However, the next day, K.B. secured a temporary PFA order, which was sent to Appellant's place of employment and home. *Id.* Appellant, who is married, opined that K.B. requested the PFA order because she was "vindictive," wanted to ensure his wife would find out about their past relationship, and desired to embarrass him with his employer. *Id.* at 31, 33. He also opined that she pursued the PFA order to prevent Appellant from taking his dining room table, which he left at K.B.'s house. *Id.* at 33. Appellant admitted he went to K.B.'s house after the relationship ended. *Id.* at 32. However, he indicated he went "just once" to apologize for a previous accusation that he had made against her. *Id.*

At the conclusion of the hearing, the trial court entered a final PFA order, which is to be "in place for two years." *Id.* at 35. The trial court specifically directed Appellant to have no contact with K.B. *Id.* Appellant filed a motion for reconsideration, which the trial court denied, and this timely appeal followed on August 15, 2018. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

Initially, we note our standard of review. "In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of

discretion." **Boykai v. Young**, 83 A.3d 1043, 1045 (Pa.Super. 2014) (citation and internal quotation marks omitted). "The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." **Buchhalter v. Buchhalter**, 959 A.2d 1260, 1262 (Pa.Super. 2008) (citations omitted).

In his first issue, Appellant contends that, in entering a final PFA order, the trial court erred in ignoring some portions of K.B.'s testimony. **See** Appellant's Brief at 12-15. We find Appellant is not entitled to relief.

Appellant has not set forth precisely which testimony he believes the trial court "ignored." In any event, we dispose of this claim simply by noting that credibility determinations are for the finder of fact and, accordingly, in the case *sub judice*, the trial court was free to believe all, some, or none of K.B.'s testimony. **See Fonner v. Fonner**, 731 A.2d 160 (Pa.Super. 1999).

In his second and third issues, Appellant contends the trial court abused its discretion in finding sufficient evidence to support the PFA order.

> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

**Fonner**, 731 A.2d at 161 (internal citations omitted).

"[T]he [PFA] Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." *Snyder v. Snyder*, 629 A.2d 977, 982 (Pa.Super. 1993). A "preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *Raker v. Raker*, 847 A.2d 720, 724 (Pa.Super. 2004).

The PFA Act defines "abuse," in relevant part, as follows:

> **"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> ***
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a).

In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of bodily injury. **See *Raker*, *supra*.** "The intent of the alleged abuser is of no moment." *Buchhalter*, 959 A.2d at 1263. Moreover, this Court has held that past acts are significant in determining the reasonableness of a PFA petitioner's fear. *Id.* at 1264. As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply. *Id.*

Viewing the evidence in the light most favorable to K.B., we conclude there was ample evidence from which the trial court could find, by a preponderance of the evidence, that Appellant engaged in a course of conduct and/or repeatedly committed acts towards K.B. under circumstances which placed K.B. in reasonable fear of bodily injury. *See* 23 Pa.C.S.A. § 6102(a).

For instance, K.B. testified that, near the end of their relationship, Appellant became verbally abusive, and she recalled an incident where Appellant took a butcher knife from K.B.'s kitchen drawer and "butchered" an air mattress in K.B.'s presence. N.T., 7/16/18, at 21. During the "butchering [of] the bed" incident, Appellant called K.B. "a whore" and "a bitch." *Id.* She testified she was "scared to death" during the incident. *Id.*

Further, K.B. testified that, after she ended the relationship, Appellant continued to text her, came to her house uninvited, and seemed to be tracking her movements. She indicated that, at least three times a week, he would confront her outside of her home. During the confrontations, Appellant would scream, curse, and holler in her face. She also indicated Appellant would leave notes on her door and, on one occasion, propped her screen doors open so that she would know he had been at her home. She recalled an incident outside of a gym when Appellant "suddenly appeared" in the parking lot,

grabbed her t-shirt, and pushed her back. K.B. testified that she is terrified of Appellant, she does not feel safe in her home, and she feels threatened.[3]

Since K.B.'s testimony, which the trial court deemed credible, shows that K.B. suffered abuse because of Appellant's conduct within the meaning of Section 6102(a)(5), we discern no error of law or abuse of discretion in the trial court's entry of the PFA order in favor of K.B. and against Appellant. ***See T.K. v. A.Z.***, 157 A.3d 974 (Pa.Super. 2017) (holding the appellee established abuse under Section 6102(a)(5) of Act, where the appellant repeatedly followed the appellee in his vehicle, in local grocery stores, at sporting events, and in other locations; the appellant tracked the appellee's whereabouts and constantly drove past her home while honking the car horn; the appellee testified about deep concern for her safety and fear that the appellant's behavior would eventually escalate to cause her bodily harm); ***R.G. v. T.D.***, 672 A.2d 341 (Pa.Super. 1996) (holding the appellee established abuse under Section 6102(a)(5) of Act, where the appellant repeatedly called the appellee and sent her unwanted, threatening e-mails; the appellee testified she was "very scared" by the appellant's increasingly hostile messages and was afraid to walk around campus).

---

[3] We note Appellant admitted during his testimony that K.B. told him that she was "afraid of [him]. You're going to do something to me." N.T., 7/16/18, at 30.

We note that, in large part, Appellant's sufficiency argument rests on challenges to the credibility of K.B.'s testimony. However, we defer to the trial court's credibility determinations, and we are not entitled to re-weigh the evidence.[4] *See Fonner*, *supra*. Thus, we find no merit to Appellant's sufficiency of the evidence argument.

In his final claim, Appellant contends the trial court erred in interrupting his testimony and making a ruling without permitting Appellant "to present his evidence." Appellant's Brief at 31. Specifically, Appellant contends that,

_____

[4] Appellant claims the trial court erred in believing K.B.'s testimony since her testimony was inherently contradictory, as well as contradictory to Appellant's testimony. This is more appropriately a challenge to the weight of the evidence and not the sufficiency of the evidence. *See Commonwealth v. Antidormi*, 84 A.3d 736 (Pa.Super. 2014) (setting forth distinct standards of review for weight and sufficiency of the evidence claims). In any event, assuming, *arguendo*, Appellant adequately raised a weight claim, we note the trial court explained the following:

> Having observed the demeanor and attitude of both parties, it was the [trial] court's opinion that K.B.'s testimony was more credible than [Appellant's] and that the testimony established abuse under the PFA Act.
>
> ***
>
> [Appellant] wants the court to believe that his ex-girlfriend became so vindictive that she concocted a story about being terrified, filed a petition for protection from abuse, went to court twice, committed perjury twice, and testified falsely in an adversarial hearing. The trial court was free to reject [Appellant's] version of events in favor of K.B.'s testimony, and did so according. As such, there is no reason to disrupt the trial court's analysis.

Trial Court Opinion, filed 10/17/18, at 12-13. Under our deferential standard of review, we agree with the trial court's analysis and find no abuse of discretion. *See Antidormi*, 84 A.3d at 758 (holding appellate review of weight claim is review of discretion and credibility determinations are for finder of fact).

while the trial court permitted him to testify he had a note indicating he had been out of work on leave because of an injury, the trial court did not ask to see the note. Further, Appellant avers that he was not given the opportunity to explore K.B.'s motive in filing the PFA petition, including informing the trial court that K.B. did not file the PFA petition until after Appellant came to her house with the police, as well as informing the trial court of his belief that K.B. is being vindictive. *See* Appellant's Brief at 35-36.

Initially, we note the trial court has broad discretion with regard to the admissibility of evidence. *Schuenemann v. Dreemz, LLC*, 34 A.3d 94 (Pa.Super. 2011). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or [unduly] prejudicial to the complaining party." *Ettinger v. Triangle-Pacific Corp.*, 799 A.2d 95, 110 (Pa.Super. 2002).

In the case *sub judice*, our review of the hearing transcript reveals that Appellant testified "I have a note here stating that I've been out of work on FMLA because of my injury, which [K.B.] is aware of." N.T., 7/16/18, at 31. There is no indication that Appellant offered to show the trial court the note or asked that it be marked as an exhibit. In any event, since Appellant testified to the contents of the note, we discern no prejudice. *See Ettinger*, *supra*.

As to Appellant's claim the trial court prevented him from exploring K.B.'s motive, we note Appellant testified at length as to the reasons he

believed K.B. filed the PFA petition, including his belief that she was being vindictive, wanted his wife to know about the relationship, sought to prevent him from taking a dining room table, and desired to harm his reputation with his employer. N.T., 7/16/18, at 30-33. Appellant also specifically informed the trial court during his testimony that K.B. did not file the PFA petition until after he came to her house with the police in order to retrieve his belongings. *Id.* at 31. Accordingly, we find no merit to Appellant's claim that he was prevented from presenting his evidence.[5]

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/19

_____

[5] To the extent Appellant suggests generally that the trial court was biased and did not give him the same opportunity as K.B. to finish or present his evidence, we find no merit to the claim. Rather, the record reveals the trial court conducted an examination of both *pro se* parties in an attempt to solicit relevant testimony, maintain an efficient pace in the proceedings, and reach a fair and just result based upon the facts adduced through the testimony of the witnesses. Appellant was given ample opportunity to present his evidence. While we acknowledge the trial court's continuing obligation to remain impartial and to avoid the appearance of bias, we perceive no manifestation of such conduct in the record before us.