J-A20042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| ELIZABETH HAINES | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARK SUCHEVITS | : | |
| | : | |
| Appellant | : | No. 369 WDA 2021 |

Appeal from the Order Entered February 17, 2021
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD-21-00191

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:           **FILED: NOVEMBER 8, 2021**

Mark Suchevits (Appellant) appeals from the protection from abuse (PFA) order entered in the Allegheny County Court of Common Pleas, prohibiting him from harassing, threatening or contacting his ex-girlfriend, Elizabeth Haines (Appellee) for a period of two years.  On appeal, Appellant contends the evidence was insufficient to support the entry of the PFA since he committed no acts which placed Appellee in reasonable fear of bodily injury or in present danger of further abuse.  For the reasons below, we affirm.

Appellee obtained a temporary PFA order against Appellant on February 4, 2021.[1]  The next day, police officers filed an indirect criminal contempt complaint against Appellant for his violation of the PFA order, just hours after

_____

[1] The order was not docketed until the following day, February 5, 2021.

being served with the petition. *See* Indirect Criminal Contempt Complaint, 2/5/21.[2]  On February 11, 2021, the trial court conducted a hearing on the PFA petition.[3]  The facts underlying the entry of the PFA, as presented during the PFA hearing, are as follows.

The parties were in a romantic relationship and lived together in Appellant's home, with his children, for approximately a year. *See* N.T. PFA H'rg, 2/11/21, at 4-5, 56.  Although Appellee moved out in August of 2020,[4] the relationship continued until late November or early December, when it finally ended. *Id.* at 5.  In January of 2021, Appellee began receiving voicemails from Appellant, who would call after she went to bed. *Id.* at 7.  She did not respond, and blocked Appellant's phone number. *Id.* at 6.  Appellant then, however, began "reaching out" to her through friends and family, and texted her using his 10-year-old son's phone number. *Id.* at 8.  In one such text, Appellant called Appellee degrading names and threatened to send intimate videos to her then-boyfriend. *See id.* at 10.  He ended the text by stating, "Stay tuned." *Id.*  Appellee then blocked the phone numbers

---

[2] We note the complaint was not docketed until February 26, 2021.

[3] 23 Pa.C.S. § 6107(a) (court must hold hearing within 10 days of filing of PFA petition).

[4] The reasons for Appellee's departure from the home are disputed.  Appellant testified that, although he did not "kick her out[,]" Appellee moved out of his home because she was "drinking" and getting "snippy" with his kids to the point where "it was getting unhealthy."  N.T., PFA H'rg, at 56.

of Appellant's son and friends. *Id.* at 12. She testified the texts made her "fearful" for her safety because she "knew it wouldn't stop." *Id.*

Subsequently, Appellee began receiving calls and texts from 25 to 30 random, unknown phone numbers. N.T., PFA H'rg, at 13-14. She testified that Appellant told her he downloaded an app which "generat[ed] different numbers [so he could] get ahold of [her]." *Id.* at 9. Appellee explained the messages also had the same verbiage and punctuation as those Appellant sent previously. *Id.* at 14-16.

Appellee described her relationship with Appellant as "very toxic," and explained that he would often yell and scream at her and call her debasing names. N.T., PFA H'rg, at 21-22. Because she was 20 years younger than Appellant, Appellee stated she "felt very helpless in certain situations" and "very scared at certain times." *Id.* Appellee testified her sister and her sister's boyfriend helped her move out when Appellant was not there because she was "scared." *Id.* at 22. Although she acknowledged Appellant never "laid a finger on her" or "threatened to physically beat" her, Appellee knew his former wife filed a PFA against him — which, according to Appellant's counsel was later withdrawn[5] — and that Appellant "beat up [his former wife's] boyfriend." *Id.* at 29-30

---

[5] Appellee stated she did not know the prior PFA had been withdrawn. N.T., PFA H'rg, at 29.

Despite her fears, Appellee agreed to meet with Appellant on February 1, 2021, at a gas station parking lot. *See* N.T., PFA H'rg, at 17-18. She hoped that "this was the way it would truly be over" and she could "make him stop contacting" her. *Id.* at 30. Appellee testified they "both said [their] goodbyes" and that was the last time she "was supposed to ever hear from him." *Id.* at 18. However, it was not. In fact, Appellant called her the next day, February 2nd, and told her "he was on the floor [and] couldn't get up," and that he "was praying that he would go to sleep and not wake up." *Id.* at 19. Appellee reached out to Appellant's friend to check on him. *Id.* The following day, February 3rd, she received another text from Appellant, using an unknown number, in which he accused her of lying "to [his] face" and manipulating him. *See id.* at 19-20.

Appellant decided to file a PFA petition on February 4, 2021, the same day her father passed away. N.T., PFA H'rg, at 20. As she was waiting in line to file the petition, she began receiving text messages from Appellant. *Id.* After offering condolences about the death of Appellee's father, Appellant stated:

> I won't send anything to [your boyfriend] today, and I'll respect your grief today. If I don't hear from you by tomorrow morning to tell me you are coming out to seriously and genuinely apologize to my face with the real truth about what you did to me when I have already prepared everything, this is the last time you'll hear from me about anything. What you do from here is more about all that you owe me.

- 4 -

*Id.* at 20-21. Appellee construed this text to mean that Appellant intended to send intimate photos or videos to her then-boyfriend.[6] *Id.* at 21.

Two hours after the PFA was served on Appellant, he sent another text message — again from a random number — to Appellee, in which he stated he hated her and hoped she would "never find love or happiness." N.T., PFA H'rg, at 24. He also promised to "make sure every guy [learns] the truth [about her, even if he had to] die doing it." *Id.* Appellant ended the text by calling her "an ugly evil woman inside and out." *Id.*

Appellant testified in his own defense. He denied that their relationship was toxic and stated they "actually talked about engagement and marriage in the future." N.T., PFA H'rg, at 47. Appellant claimed, however, that he learned she was seeing her then-boyfriend while she was still dating him, and he "just wanted the truth." *Id.* at 49, 56-57. Appellant stated he never intended to send a sexually explicit photo or video, but instead, was going to send "simply a picture from Thanksgiving . . . to prove that [they] were still spending . . . intimate time and time with [his] children . . . through December." *See id.* at 49-50. Appellant did not deny that he sent numerous texts to Appellee, or that he used an app to bypass the block on her phone. *See id.* at 56-60.

_____

[6] We note that Section 3131 of the Crimes Code criminalizes the dissemination of "a visual depiction of [a] former sexual . . . partner in a state of nudity or engaged in sexual conduct" when done so with the "intent to harass, annoy or alarm [the] former sexual . . . partner[.]" 18 Pa.C.S. § 3131(a).

Francis Joby Palumbo, III, a mutual friend of the parties, also testified for Appellant. He stated that Appellee reached out to him during the time she was receiving the text messages from Appellant. N.T., PFA H'rg, at 44. When asked if she ever expressed that she "was in any fear of [Appellant], that he would cause serious bodily injury to her[,]" Palumbo replied, "No." *Id.* at 44-45. After Appellant's testimony, Appellee was permitted to read text messages between her and Palumbo in which she stated, *inter alia*, Appellant would "not leave [her] alone, will not stop texting [her], will not stop threatening." *Id.* at 63. Palumbo's response was that Appellant had stayed with him the night before and was "definitely a mess." *Id.* at 64. Palumbo also expressed that he and Appellant's friends were "really worried about" Appellant, whom Palumbo described as "definitely unstable." *Id.* at 64-65.

At the conclusion of the hearing, the trial court issued a final PFA, directing that Appellant, *inter alia*, have no contact with Appellee for a period of two years. *See* N.T. PFA H'rg, 2/11/21, at 66; Order, 2/11/21, at 2. The court, however, declined to find Appellant guilty of indirect criminal contempt, commenting, "It's not necessary at this point." N.T., PFA H'rg, at 66. This timely appeal followed.[7]

Appellant raises one issue, with two sub-issues, for our review:

> Whether the [t]rial [c]ourt factually and legally erred and abused its discretion in finding [Appellant] was in violation of the

---

[7] Appellant complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

- 6 -

      Protection From Abuse Statute . . . by a preponderance of the evidence for each and every of the following reasons:

      a.  The evidence presented by [Appellee] was not sufficient to support a final [PFA] in that [Appellant] committed no acts which placed [Appellee] in reasonable fear of bodily injury. To the contrary, [Appellant's] social media communications did not contain an iota of bodily threats or injury to [Appellee] or her current boyfriend. All of the social medial communications alleged in the PFA Complaint and testified about by [Appellee] concerned words such as "whore, c—nt, twisted, selfish, sick," and veiled promises to send explicit picture of her to her current boyfriend.

      b.  The evidence presented by [Appellee] was not sufficient to support a final [PFA] in that [Appellant] committed no acts which placed [Appellee] in an immediate and present danger of further abuse from [Appellant]. To the contrary, the social media communications made by [Appellant] to [Appellee] clearly stated, "this is the last you'll hear from me."

Appellant's Brief at 4.

      Our standard of review of a PFA order is well-settled: "[W]e review the trial court's legal conclusion for an error of law or abuse of discretion." *E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa. Super. 2020) (citation omitted). Where, as here,

      a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a **preponderance of the evidence**. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa. Super. 2019) (emphasis added and citation omitted). "A 'preponderance of the evidence standard is defined as

- 7 -

the greater weight of the evidence, *i.e.*, [enough] to tip a scale slightly.'" ***E.K.***, 237 A.3d at 519 (citation omitted).

The Protection from Abuse Act empowers a trial court to grant a protection order "to bring about a cessation of abuse[.]" 23 Pa.C.S. § 6108(a). The Act defines "abuse," *inter alia*, when a "sexual or intimate partner [k]nowingly engag[es] in a course of conduct or repeatedly commit[s] acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury." 23 Pa.C.S. § 6102. In determining the reasonableness of a petitioner's fear, "[t]he intent of the alleged abuser is of no moment[,]" and "[p]ast acts are significant[.]" ***K.B.***, 208 A.3d at 128 (citation omitted). Moreover, "[a]s the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply." ***Id.***

In the present case, Appellant argues the evidence presented by Appellee was insufficient to support a PFA order. He insists "there is not a scintilla of evidence that . . . Appellant was threatening [Appellee] with any physical harm[.]" Appellant's Brief at 10. Rather, Appellant maintains the record demonstrated he "was using degrading/demeaning language" and promised to disclose an intimate video of "two consenting parties." ***Id.*** at 11. Although Appellee testified she was fearful for her safety, Appellant argues that the content of the text messages and voicemails did not support her purported fear; there was "no threats of violence, no intent to physically harm

her, no indication of stalking; no indication of controlling her movements; and no present/future ability to inflict any bodily injury upon her." *Id.* at 13-14.

Furthermore, Appellant emphasizes that despite her alleged fear, Appellee agreed to meet with him. *See id.* at 14. Contrary to the trial court's description of his behavior as "escalat[ing,]" Appellant notes the parties' final meeting at the gas station parking lot was a "calm discussion," which both left "without incident." *Id*. at 15. Appellant also emphasizes Appellee's acknowledgment that he "never laid a finger on her and never threatened her physically to beat her up." *Id.* at 13. In support of his argument, Appellant cites several unpublished decisions of this Court upholding the entry of a PFA under circumstances more dire than those presented herein. *See id.* at 15-16. Rather, Appellant argues the facts in the present case are "comparable" to those in *Ferri v. Ferri*, 854 A.2d 600 (Pa. Super. 2004), in which this Court reversed a PFA order entered against a mother after she slapped her minor daughter.

The trial court addressed Appellant's challenge as follows:

> The communications sent by [Appellant] contain no overt threats of physical violence, nor had he ever physically assaulted [Appellee]. She credibly testified, however, that her fears began after December of 2020 and continued when [Appellee] refused to stop contacting her, began using an app so he could text her anonymously, and peaked when he continued to contact her and make deranged comments even after she relented and met him in an attempt to end the abusive communications. She testified that this escalation in the communication caused her to be fearful for her safety. I found this testimony sufficient to demonstrate that [Appellee] was in reasonable fear, not just that [Appellant]

might disseminate intimate videos of her which was [his] specific threat, but that her physical safety was in peril.

\* \* \*

. . . I found it reasonable that [Appellee] would fear for her physical safety due to the irrationality of [Appellant's] communication and its escalation. I also found that this fear was reasonable based on the communications she received from their mutual friends, one of who testified at the hearing, regarding the fragile mental condition of [Appellant].

\* \* \*

I found [Appellee] to be credible. [Appellant's] testimony that he simply wanted an apology for [Appellee's] infidelity was not credible. Moreover, [Appellant] himself testified that he sent the messages in question and that he used an app to bypass the blocking of his number in order to continue to harass [Appellee]. This demonstrated an unhealthy, escalating, and very likely dangerous obsession with her. Accordingly, I found her fear entirely reasonable[.]

[Appellant] also argues that the evidence was insufficient to demonstration future abuse because his statement "This is the last you will hear from me" demonstrates that the abuse was ending. To the contrary, I found this statement could just as reasonably be interpreted in a much more ominous fashion, insinuating the death of the recipient or the bearer of the message, rather than the end of communication from [Appellant].

Trial Ct. Op., 5/4/21, at 5-6.

Our review reveals no abuse of discretion on the part of the trial court in entering a PFA order against Appellant. The trial court credited Appellee's testimony that Appellant's berating text and voice mail messages, which escalated in intensity, reasonably caused her to fear for her safety. While Appellant did not explicitly threaten to physically harm Appellee, we agree the tone and frequency of his messages "demonstrated an unhealthy, escalating and very likely dangerous obsession with her." Trial Ct. Op., at 6.

Appellant emphasizes that Appellee acknowledged he "never laid a finger on her [or] threatened . . . to beat her up." Appellant's Brief at 13. Thus, he implies their prior history did not support her purported fear that he would physically harm her. *See id.* at 16-17 ("This critical omission undermines the finding of reasonableness for [Appellee] to harbor under the fear of imminent bodily injury being inflicted on her by . . . Appellant."). However, Appellant ignores Appellee's testimony that their relationship was "very toxic," that she "felt very scared at certain times[,]" and that he would yell and scream at her and call her degrading names. N.T., PFA H'rg, at 21-22. Appellee was also aware that Appellant's former wife filed a PFA against him — although Appellant claims it was later withdrawn — and that Appellant "beat up" his former wife's boyfriend. *Id.* at 29. Under these circumstances, the trial court did not abuse its discretion when it determined Appellee's fear of bodily injury at the hands of Appellant was reasonable.

Furthermore, Appellant's reliance on *Ferri* is misplaced. In that case, the petitioner was the biological father of the child victim, and the appellant was the biological mother of the child. *Ferri*, 854 A.2d at 601. The parties were separated, but lived across the street from each other. *Id.* The appellant had interim custody of the child, who was six years old at the time of the incident. *Id.* On the evening in question, a neighbor witnessed the appellant "trying to get [the child] into her house." *Id.* The child, however, saw the petitioner in his window "and started waving and yelling, 'Daddy', trying to get her father's attention." *Id.* The witness observed the appellant

- 11 -

slap the child, as she continued to yell, "Daddy, daddy, come and get me." *Id.* The witness called petitioner, who, in turn, contacted Children and Youth Services (CYS). *Id.* CYS was unable to interview the child that evening. *Id.*

When petitioner regained custody of the child two days later, he took her to the doctor. *Ferri*, 854 A.2d at 602. The child reported that the appellant "slapped her hard on the face 'the other night[,]'" although the medical examination revealed no bruising. *Id.* The child's "story remained consistent" when she was subsequently interviewed by CYS. *Id.* The trial court entered a PFA order against Appellant. *Id.* The order also amended the petitioner's custody status, granting him additional supervised visitation time. *Id.*

On appeal, this Court reversed, concluding the record was "devoid of any evidence that [the child] was in reasonable fear of imminent bodily injury[,] nor [did petitioner] argue that [the child] was in fear." *Ferri*, 854 A.2d at 604 (footnote omitted). The Court emphasized that corporal punishment by a parent is not against the law, so long as it is properly imposed and does not produce bodily injury. *Id.* Moreover, the *Ferri* panel commented that the PFA Act should not "be exploited as a tool in disputed custody matters." *Id.* (footnote omitted).

Unlike Appellant, we do not agree the facts in *Ferri* are comparable to those presented in the case before us. In *Ferri*, the "abuse" consisted of a mother slapping her child **once** when the child was not listening to her. The child suffered no injury, and did not express that she was fearful of her

mother. Further, the petitioner was the child's estranged father, who watched the events unfold and, apparently, desired a change in the custody arrangement.

Conversely, here, Appellee ended a toxic relationship with Appellant, who verbally berated her. Although she blocked his phone number to cease communication, Appellant continued to send her harassing and degrading text messages from his son's phone, and other random numbers, and threatened to send an intimate video to her then-boyfriend. The tone of the messages escalated before Appellee agreed to meet with him for closure. After their meeting, Appellant continued to send Appellee text messages, which caused her to fear for his safety, as well as her own. Indeed, despite Appellant's promise that one text was the "last time [she'd] hear from [him,]" Appellant texted her again — **two hours** after he was served with the PFA — in which he continued to call her vile names, and promised "to make sure every guy" learns "the truth" about her even if he had to "die doing it." N.T., PFA H'rg, at 20, 24. The trial court found that Appellant's irrational, incessant communications, coupled with his "fragile mental condition," supported Appellee's testimony that she was in fear of her own safety. *See* Trial Ct. Op. at 6.

Upon our review of the record in the light most favorable to Appellee, the petitioner, we agree "the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." *See K.B.*, 208 A.3d at 128.

Detecting no abuse of discretion on the part of the trial court, we affirm the PFA order entered against Appellant.  *See E.K.*, 237 A.3d at 519.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  11/8/2021