J-S45002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| RANDI L. RANCK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA A. RANCK | : | No. 891 MDA 2024 |

Appeal from the Order Entered June 7, 2024
In the Court of Common Pleas of Mifflin County Civil Division at No(s):
2024-00204

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                    **FILED: JANUARY 8, 2025**

Appellant, Randi L. Ranck ("Wife"), appeals from the June 7, 2024 order entered in the Court of Common Pleas of Mifflin County, which denied her petition filed under the Protection from Abuse Act ("PFA")[1] against Appellee, Joshua A. Ranck ("Husband").  We affirm.

Husband and Wife began dating in 2013 and married on September 3, 2016.  Husband has two children, Joshua Ranck (age 19) and Kylie Ranck (age 21).  Wife has three children, Isabella Mattern (age 19), B.H. (age 16), and D.H. (age 13).  Husband and Wife, with the aforementioned children, lived together for approximately ten years in the family residence along River Road in Mifflin County, Pennsylvania.

---

[1] 23 Pa.C.S.A. §§ 6101-6122.

In September 2023, Wife engaged in an extra-marital affair with Austin Gurner. Husband learned of Wife's affair in November 2023. On January 8, 2024, Wife filed a Complaint for Divorce. Thereafter, on March 14, 2024, Wife filed for a temporary PFA order on behalf of herself, as well as her minor children, B.H. and D.H. In her filing, Wife alleged, *inter alia*, that she was afraid of Husband; that Husband engaged in harassing behavior, including calling her names, driving by her place of employment while attempting to contact her "all day long;" and that Husband "manipulates her children and tries to get them on his side, even to the point where they all blocked [her] from leaving [her] bedroom once." Wife's Petition, 3/14/24, at 2. Thereafter, a temporary PFA order was entered which prohibited Husband from contacting Wife, B.H., and D.H. The order also evicted and excluded Husband from the family residence.

The trial court convened full evidentiary hearings on Wife's petition on March 28, 2024, April 10, 2024, and May 29, 2024. On March 28, 2024, Wife and a work colleague, Jackie Voltz, testified. On April 10, 2024, Wife, Husband and Austin Gurner testified. On May 29, 2024, Isabella Mattern, D.H., B.H., Husband, and Christopher Miller, Wife's brother-in-law, testified. The trial court summarized the respective testimony as follows.

> Jackie Voltz took the stand for [Wife] and testified to what she saw and heard as [Wife's co-worker]. Ms. Voltz stated that she saw [Wife] upset at work. Ms. Voltz testified that she never personally observed any interactions between [Husband] and [Wife]. Ms. Voltz testified that [Wife] was unfaithful in her marriage but was trying to make things right with the children.

. . . [Wife] testified that [Husband] exhibits anger issues. [Wife] testified that [19] years ago[, Husband] was involved in a bar fight, but she was not present to witness it. [Wife] testified that approximately [10] years ago[, Husband] was involved in a fight with another man at the family butcher shop but she did not witness it. [Wife] testified that in December[] 2023, the children and [Husband] stood in her bedroom and would not let her leave until they addressed their concerns. [Wife] claimed she was too scared to call the police or file for a [PFA] order. [Wife] testified that she was with Mr. Gurner in November 2023, when her daughter, Isabella[,] saw them together at the boat launch near their home. She testified that she lied . . . about where she was. [Wife] testified that she brought Mr. Gurner to Boalsburg Brewing Company and Duffy's Tavern to meet her sister.

[Wife] claimed that [Husband's] behavior was getting worse during this time and that she was afraid of what he was going to do, but not physically afraid of him. [Wife] claimed that [Husband] told the children about the affair and that they did not see it for themselves. [Wife] stated that she wanted the children to attend therapy and that the children want nothing to do with her. [Wife] also testified that before all of this, [Husband] was a good father and that she did not file for the [PFA] order to help her gain custody.

[Wife] testified that she installed cameras inside her home; however, minor child B.H. broke the cameras. [Wife] also testified to [Husband's] behavior after he learned of Wife's extra-marital affair. In particular, Wife introduced various exhibits of text messages exchanged between her and Husband from November 5, 2023 through December 30, 2023, wherein Husband expressed hurt and frustration over Wife's behavior, repeatedly requested Mr. Gurner's phone information, threatened to stop by Wife's place of employment, and otherwise sought to reconcile their relationship. In addition, Wife testified to an incident that occurred December 2, 2023. That morning, Wife told her daughter, Isabella, that she was feeling ill and was going to see the doctor. Eventually, however, Wife stopped responding to Isabella's text messages and stopped sharing her location *via* Life360[, a family location app]. Isabella came home from work late that evening and, after discovering that Wife was not at the family residence, started to worry about Wife's welfare. Isabella informed Husband of her concerns after he arrived at the family

residence. Husband sent a text message to Wife asking if she was with Mr. Gurner. Wife replied and indicated that she was ok, but would not be home that evening. Notwithstanding Wife's representation, Husband and Isabella went to Wife's last known location to try to ensure of her safety. The two did not locate Wife. Ultimately, Wife returned to the family residence the next day. Wife also testified that someone keyed her car and, while she believed it was [Husband], she admitted] that she did not know who keyed her car and it might have been Mr. Gurner's wife.

[Wife further claimed that Husband] woke her up one morning in early January and called her a 'pretty little whore'. This led [Wife] to file a petition for a [temporary PFA order] on March 14, 2024. After the temporary [PFA] order was entered, [Wife] installed a camera facing the backyard and back door. She watched [Husband's] son and his friend remove the guns from the home and [testified that this] scared her. [Wife] testified that after the affair, [Husband] said she deserved to be punished and that is why she [was] seeking a three-year [PFA] order. [Wife] testified that she wanted a divorce in November[] 2023, but filed for divorce in January 2024. [Wife] claims she was scared to death in January[] 2024. However, [Wife's] attorney advised her to stay living in the home and suggested she file for this [PFA] order for her safety.

[Wife's] attorney called [Husband] on cross-examination on April 10, 2024. [Husband] said he was angry about the affair. [Husband] testified that he believed that [Wife] should be more apologetic about having an affair. [Husband] testified that he and the children want [Wife] to move out of the home and that both he and the children are upset with her.

Austin Gurner testified on April 10, 2024. Mr. Gurner is the individual with whom [Wife] had an affair. He testified that he met [Wife] while she worked at the bank in Centre County. He also testified to having a conversation with [Husband] and indicated that the affair was over.

Isabella Mattern took the stand on May 29, 2024[.] Isabella is [Wife's] eldest daughter[.] She testified that she first learned of Mr. Gurner when [Wife] told her he was stalking her and followed her from [] work to her residence in Mifflin County. Isabella saw [Wife] and Mr. Gurner sitting in his car kissing. Isabella testified that [Wife] lied about her whereabouts that

- 4 -

evening. Regarding the allegation that [Husband] and the children stood in [Wife's] bedroom and did not allow [her] to leave, Isabella testified that [Wife] never tried to or asked to leave the room, and she could have walked out at any point. Isabella stated that the entire family was angry at [Wife] but nobody ever threatened her.

Isabella stated that the children are not afraid of [Husband] and that [Husband] is not manipulating the children. Isabella testified that [Husband] made efforts to make the marriage better, while [Wife] did very little. Isabella testified that from November[] 2023 to the present, [Wife] disappeared for days at a time, was gone every weekend, left for random days out of the week, and rarely told anyone where she was going. Testimony also indicated that [Wife's] assertion that the children walk on eggshells around [Husband] is untrue. Isabella also testified that [Wife] removed minor children B.H. and D.H.'s bedroom doors from their hinges and hid them. Isabella testified that minor children B.H. and D.H. would regularly go to work on the Ranck family farm to get away from [Wife but] on one of [those] occasions . . . [Wife] called the police on [the children because they left] the house without her permission. Isabella also testified that [Wife] and Mr. Gurner are still in a relationship. Isabella testified that the minor children B.H. and D.H. want to be with their father. Isabella testified that since the [temporary PFA] order has been entered there has been limited food in the home. Isabella also testified that since the [temporary PFA] order has been [entered], her siblings are unable to participate in their extracurricular activities such as the 4H club or work on their farm. Isabella also told the [trial court] that [Wife] recently told her that she needed to sign a lease to continue living in the home and that she needed to pay her mother $400[.00 per] month in rent. Isabella also indicated that [Wife] removed $150[.00] from younger brother B.H.'s bank account without telling him, leaving a comment on the withdrawal titled "money for the cameras and gas money to go get the cameras."

[] D.H. testified on May 29, 2024. D.H. is the child of Eric Henry and [Wife], and is [13-years-old]. [Husband] has raised D.H. for the last [10] years, and D.H. calls [Husband] "Daddy Josh". D.H. testified that [Husband] taught him how to hunt, fish, and work. When told that [Wife] included in her [PFA petition] that the children are afraid of [Husband,] minor child D.H. stated

- 5 -

"She lied, I am not afraid of him!" Regarding the family bedroom incident, D.H. testified that [Wife's] allegation is false, and added, "I could [not] keep her from leaving, I do [not] know why she would say that." D.H. also testified that [Husband] has not kept D.H. from seeing family members, and stated "[Husband] is not keeping us from seeing anyone." When asked if [Husband] ever locked [Wife] out of the house, D.H, responded "[Husband] would never lock her out, we only lock the doors for safety at night." During cross-examination, the [Wife's] attorney questioned D.H. as to the [Wife's] reconciliation efforts, to which minor child D.H. stated "We tried to talk to her, she would ignore us in conversations and make smart faces at us. We even apologized for how we were treating her and she kept running off. Eventually we gave up on her." D.H. testified that [Wife] does not come home until [7:00 p.m.] or [8:00 p.m.] in the evening and rarely talks to any of the children. D.H. testified that "None of us care what she's doing anymore, she does [not] tell us anything. She runs away. I just want this done and over with." D.H. also testified that [Husband] did not involve the children in the divorce, and went on to state, "She dragged us into this, she got us involved. She ran away, and now we [are] sitting in this courtroom." When [Wife's] attorney asked D.H. if he knew that [Wife] did not want him in court that day, he replied, "She did [not] want me here for a reason."

[] B.H. testified on May 29, 2024, for [Husband]. When asked how B.H. knew [Husband] he replied "He [is] like my dad." B.H. testified that he found out about Mr. Gurner between August and November of 2023. B.H. testified that when [Wife] filed a [PFA petition] against [Husband], that greatly upset him. B.H. testified that [Husband] is not an abusive person, [] that the children do not walk on eggshells around [Husband], and that they are not afraid of [Husband]. B.H. testified that he disagreed with the accusation that the [Husband] had stopped the children from seeing anyone. When asked if [Husband] manipulates the children, B.H. replied "She manipulates us! She tries to get us on her side." B.H. testified that he is not afraid of [Husband], but is afraid of who [Wife] hangs out with and he is afraid of Mr. Gurner. B.H. also testified that "This hurts deep down. It kills me." When asked if [Husband] brought B.H. and other children into the divorce and affair, B.H. responded "[Husband] did [not] bring us into this, she did. She does [not] care about us." B.H. testified that [Wife] cheated on [Husband]

just as [she] had cheated on B.H.'s natural father. On cross-examination, [Wife's] attorney asked B.H. if he knew that [Wife] kept belongings in her car because she was scared of [Husband]?" B.H. responded, "Why does she only do that on the weekends though, and not during the week if she's so scared of him?" B.H. testified that [Wife] installed cameras in the household and it made him uncomfortable. He asked [Wife] to remove them and she refused, he told [Wife] if she did not remove the cameras, then he would. B.H. testified that he broke the cameras because he was upset and wanted them gone. B.H. also testified that [Wife] called the police on him and his brother because they went to work on the Ranck family farm.

Joshua Ranck is [Husband's 19-year-old] son . . . and he testified on May 29, 2024. [Joshua] testified that he is not afraid of [Husband] and that he does not believe anyone is afraid of [Husband]. [Joshua] stated that he has never had to walk on eggshells around [Husband] and does [not] believe anyone else has had [to] either. [Joshua] testified that the relationship between [Husband] and [Wife] was fine until [Wife] cheated. [Joshua] testified that [Husband] has never tried to keep the other children from seeing family. [Joshua] testified that he and the other children would ask [Wife] why she was making their life a "living hell" and [Wife] would laugh at them.

Christopher Miller, [Wife's] brother-in-law[,] testified on May 29, 2024. He testified that his wife and [Wife] went out for drinks at Boalsburg Brewing Company and dinner at Duffy's Tavern in mid-November. Unbeknownst to Mr. Miller's wife, [Wife] invited Mr. Gurner and his friend. He testified that his wife witnessed a kiss between [Wife] and Mr. Gurner. Mr. Miller testified that he and his wife informed [Wife] that if she did not tell [Husband] what happened, then he and his wife would. Mr. Miller also testified that during the first week of January, Mr. Miller asked [Wife] if they could talk because he was concerned about her. During their meeting, he asked if she was afraid of [Husband], to which she replied "No, he's a good man. He does [not] deserve this."

[Husband] testified on May 29, 2024. [Husband] testified that after [Wife] filed for divorce, she was looking for a new residence. He added that he tried to help her and that the children did not wish to go with her. However, he indicated that [Wife] decided to stay in the home after being advised by her

- 7 -

attorney. [Husband] testified that he wakes up for work at 4:00 a.m. throughout the week, and sometimes [Wife] would not come home until 2:00 a.m., waking him up. [Husband] testified that he [is] surprised he [is] not more upset by [Wife's] infidelity given the fact that they have been together for [10] years. When asked about the alleged incident where [Husband] and the children did not allow [Wife] to leave her bedroom, [Husband] explained that she could have absolutely left whenever she wanted to. [Husband] admitted to standing between [Wife] and Isabella during this incident, but only because he thought [Wife] was going to hit her daughter. [Husband] denied turning [Wife's] family against her, in addition to denying prohibiting any children from seeing [Wife's] family members. [Husband] testified that the last few months have been difficult because he is paying all of the bills, buying all of the groceries, and taking care of the children. According to [Husband], [Wife] told him "It [is] not fair I [am] staying here and not paying for anything." [Husband] testified that neither the children nor [Wife] are afraid of him. [Husband] testified that he believes the [PFA] petition is a strategy being used to help [Wife's] side in the divorce. [Husband] testified that he filed for [e]xclusive [p]ossession of the home, and [Wife] filed for a temporary [PFA] petition three [] days later. [Husband] testified that he has never been physically or emotionally abusive. [Husband also indicated that he] encouraged the children to have a relationship with [Wife].

Trial Court Opinion, 6/7/24, at 6-13. Ultimately, on June 7, 2024, the trial court denied Wife's PFA petition. This timely appeal followed.

Wife raises the following issue for our consideration.

[Whether the trial court abused its discretion and/or erred as a matter of law in denying Wife's petition for a final PFA order?]

***See generally*** Wife's Brief at 4-5.[2]

_____

[2] The appellate issues presented by Wife are, verbatim, as follows.
*(Footnote Continued Next Page)*

- 8 -

On appeal, Wife claims that the trial court erred in denying her petition for a final PFA order. In support, Wife cites to the "substantial evidence"

1. Did the trial court abuse its discretion and/or err as a matter of law when it failed to grant Wife's [PFA petition] when the record reflects substantial evidence [that] Husband has admitted to having anger issues, has a history of physical violence, stalked Wife at a campground in the early morning hours despite Wife telling Husband she needed space, and knowingly engaged in a course of conduct that placed Wife in reasonable fear by conveying in a multitude of ways physical harm toward Wife, placing her in reasonable fear?

2. Did the trial court abuse its discretion and/or err as a matter of law [in denying Wife's PFA petition] where there was sufficient evidence presented [showing] Husband has a history of physical altercations, admitted and noted anger issues, and Husband knowingly engaged in a course of conduct that evidenced a multitude of ways where Husband repeatedly committed acts toward Wife, without proper authority, that sufficiently placed Wife in reasonable fear of bodily injury, regardless of Husband's intent to place Wife in reasonable fear of bodily injury?

3. Did the trial court abuse its discretion and/or err as a matter of law when it failed to view the evidence in the light most favorable to Wife, that the Husband engaged in a course of conduct where [] Husband on more than one occasion engaged in a multitude of ways of placing [] Wife in reasonable fear of bodily injury which involved following and tracking Wife's whereabouts, threatening and showing up at her workplace threatening to create a scene at her work place if she did not tell her supervisors she had an affair with a customer, Husband forcibly ripped the blankets off of her while she was sleeping in the middle of the night hitting her face, calling her a pretty little whore, engaging in numerous threatening acts within their home, which Wife testified for her safety and feared Husband's behaviors would eventually escalate to cause her bodily harm?

Wife's Brief at 4-5 (unnecessary capitalization omitted).

presented during the evidentiary hearings, including Husband's anger issues, history of physical violence, as well as his alleged harassment, including "stalk[ing] Wife . . . in the early morning hours" even though she told Husband "she needed space." Wife's Brief at 28. Wife avers that, coupling the aforementioned behavior together, the evidence presented was sufficient to demonstrate a reasonable fear for her safety.

Our standard of review for an order denying PFA relief is as follows:

> [T]his Court reviews the trial court's legal conclusions for an error of law or an abuse of discretion. A trial court does not abuse its discretion for a mere error of judgment; rather, an abuse of discretion occurs where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will[.] Finally, we review the evidence of record in the light most favorable to, and grant all reasonable inferences to, the party that prevailed before the PFA court.

*Kaur v. Singh*, 259 A.3d 505, 509 (Pa. Super. 2021) (internal citations and quotations omitted). It is well-settled that "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Walsh*, 36 A.3d 613, 619 (Pa. Super. 2012) (citation omitted). Thus, on appeal, "this Court defers to the credibility determinations of the trial court as to witnesses who appeared before it." *Karch v. Karch*, 885 A.2d 535, 537 (Pa. Super. 2005) (quotation omitted). Moreover, we are required to review the evidence of record in the light most favorable to, and grant all reasonable inferences in

- 10 -

favor of, the party that prevailed before the PFA court.  ***Snyder v. Snyder***, 629 A.2d 977, 983 (Pa. Super. 2004).

"Abuse" is defined by the PFA Act, in relevant part, as follows:

"Abuse." The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(2) Placing another in reasonable fear of imminent serious bodily injury.

***

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury.  The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102.

Importantly,

In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of bodily injury.  "The intent of the alleged abuser is of no moment." [***Buchhalter v.*** ]***Buchhalter***, 959 A.2d [1260,] 1263 [(Pa. Super. 2008)]. Moreover, this Court has held that past acts are significant in determining the reasonableness of a PFA petitioner's fear.  ***Id.*** at 1264.  As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply. ***Id.***

***K.B. v. Tinsley***, 208 A.3d 123, 128 (Pa. Super. 2019) (some citations omitted).

- 11 -

In denying Wife's petition, the trial court held that, based upon "all of the allegations" and "the testimony presented at trial," it did not find Wife's allegations to be credible. Trial Court Opinion, 6/7/24, at 15 ("Although [Wife] alleges that she is in fear of [Appellant] and made several claims as to why, it is this [c]ourt's determination that these claims were not credible nor reasonable considering the testimony presented, and the circumstances surrounding said allegations."). In fact, the trial court found that Wife filed the instant PFA petition "as a litigation tactic in the [parties'] divorce and custody matters." *Id.* Importantly, Wife's claims on appeal are, at bottom, a request for this Court to re-weigh the evidence in her favor and ignore the trial court's credibility determinations. This we cannot do. *See Karch*, *supra*; *see also K.B.*, 208 A.3d at 129 ("[W]e defer to the trial court's credibility determinations, and we are not entitled to re-weigh the evidence"). Because our review of the record supports the trial court's findings, we conclude that the trial court did not abuse its discretion in denying Wife's PFA petition against Husband.[3]

_____

[3] In Wife's brief, she criticizes the trial court for "lump[ing]" its discussion of 23 Pa.C.S.A. §§ 6102(a)(2) and (5) "together to create a singular definition of abuse." Wife's Brief at 38. Wife claims that, in so doing, the trial court ignored the fact that, under Section 6102(a)(5)'s definition of abuse, "imminence is not required." *Id.*; *see also* 23 Pa.C.S.A. §§ 6102(a)(2). Wife claims that, because the trial court relied on "imminence in making its determination," it "erred as a matter of law [because] it failed to appropriately evaluate the evidence in Wife's case under the lens of [Section 6102(a)(5)'s] accurate language." *Id.* In contrast to Wife's assertion, the trial court held that Husband's actions did not qualify as abuse under Section 6102(a)(2) and
*(Footnote Continued Next Page)*

Order affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 1/08/2025

---

(5) because Wife's fear of serious bodily injury was not reasonable, *i.e.*, the trial court did not find Wife's allegations credible.  **See** Trial Court Opinion, 6/7/24, at 15.  Hence, Wife's claim of error is devoid of merit.