J-S30016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| T. P. O/B/O S.P., MINOR CHILD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| G. P. | : | |
| | : | |
| Appellant | : | No. 320 EDA 2023 |
| | : | |

Appeal from the Order Entered December 20, 2022
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2022-080576

BEFORE: BENDER, P.J.E., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, J.: **FILED SEPTEMBER 19, 2023**

G.P. (Father) appeals from the order, entered in the Court of Common Pleas of Delaware County, granting T.P.'s (Mother) petition for a final protection from abuse (PFA) order with regard to the parties' minor child, S.P. (born 12/06). On appeal, Father contends that the court erred in granting the PFA order where Father's actions did not place S.P. in reasonable fear of imminent serious bodily injury. After careful review, we affirm.

Mother and Father are the parents of S.P. and her younger brother, A.P. (collectively, Children); they share legal and physical custody of Children. Mother and Father were separated at the time of the instant matter.

On April 14, 2022, Mother filed a petition for a temporary PFA order against Father on behalf of her and S.P. Mother's petition alleged that on April 13, 2022, Father and Paternal Grandmother "physically attacked [S.P.] and

made threats to her that they would have the police take [S.P.] away and she would never see anyone again." Petition for PFA, 4/14/22, at 6. Mother's petition also alleged that Mother had "[s]uffered [p]ast [p]hysical, [e]motional, and [v]erbal abuse from [Father] and had a temporary PFA [b]ecause of stalking," *id.*, and that, in the past, Father has destroyed Children's property, threatened them, and used intimidating behavior, including threatening to hit S.P. in the face. *Id.*

On April 14, 2022, the court held an *ex parte* hearing on Mother's petition. *See* 23 Pa.C.S.A. § 6107(b). Following the hearing, the trial court issued a temporary PFA order against Father only with regard to Mother. The order prohibited Father from "abus[ing], harass[ing], stalk[ing], threaten[ing], or attempt[ing] to threaten to use physical force against" Mother.[1] Temporary PFA Order, 4/14/22, at 13. The order also excluded Father from Mother's residence. *Id.* "Except for such contact with [C]hildren as may be permitted under Paragraph 5 of this order, [Father] [wa]s prohibited from having ANY CONTACT with [Mother] . . . either directly or indirectly, at any location[.]" *Id.* The temporary PFA "supersedes any prior order relating to child custody." *Id.* at 13-14. Contact between Father and Children was ordered to be limited to "phone/Facetime if Children desire." *Id.* at 14. Finally, pending the outcome of the final PFA hearing, Mother was awarded temporary custody of Children. *Id.*

---

[1] Father was also prohibited from possessing or acquiring firearms for the duration of the order. *Id.* at 14.

After several continuances, on June 23, 2022, the parties agreed to extend the temporary PFA, agreeing to a final PFA hearing date of December 22, 2022, and affording Father a graduated custody schedule with A.P.[2] The parties' agreement also removed Mother as a protected party and inserted S.P. as the protected party in her stead. On December 15, 2022, Mother filed a motion for contempt of the PFA orders, alleging Father and third parties had contacted S.P. in violation of the June 23, 2022, agreed-upon extended temporary order.

On December 22, 2022, the court held a six-hour-long final PFA hearing, during which Mother, S.P., Father's neighbor, J.S., Father, and Delaware County Police Officer Stephen Hurwitz testified. Following the hearing, the court denied Mother's contempt petition, but entered a final PFA order on behalf of S.P., dated December 30, 3022, effective for six months, or until June 30, 2023.[3] In its Pa.R.A.P. 1925(a) opinion, filed more than three

---

[2] The extended temporary order contained the same custody arrangement with regard to S.P. as outlined in the original temporary PFA—Father could have phone calls with S.P. if she so desires and Father could only contact S.P. if recommended by S.P.'s therapist.

[3] We recognize that the instant PFA order is no longer in effect, having expired on June 30, 2023. However, because the trial court is permitted to consider the December 30, 2022, PFA order in a subsequent PFA proceeding or child custody proceeding, and because the order will appear in a criminal records check conducted pursuant to 23 Pa.C.S.A. § 6105(e)(3), Father will suffer some detriment due to the entry of the PFA order, and we will not dismiss the appeal as moot. *See Spivey v. Benjamin*, 1601 MDA 2022, at *6 n.4 (Pa. Super. filed July 25, 2023) (unpublished memorandum); *see also* Pa.R.A.P. 126(b) (unpublished non-precedential memorandum decision of Superior
*(Footnote Continued Next Page)*

months later, the trial court states that it granted the final PFA order on the basis of section 6102(a)(2) of the PFA Act, and denied it[4] with regard to subsections 6102(a)(1), (3)-(5).[5] Specifically, the court stated that Mother

_____

Court filed after May 1, 2019, may be cited for persuasive value). It is well-established that

> [t]his Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court. . . . [T]his Court has employed exceptions to the mootness doctrine to review issues stemming from expired PFA orders.

**Ferko-Fox v. Fox**, 68 A.3d 917, 920-21 (Pa. Super. 2013) (per curiam) (citations omitted).

[4] Specifically, the court found that Mother did not present sufficient evidence to prove those subsections by a preponderance of the evidence.

[5] The trial judge acknowledges in her opinion that the final PFA form order "did not include boxes for the court to check to indicate the statutory basis or bases for its decision. **In hindsight, the trial court should have included the statutory basis for its decision in its Final PFA Order or Additional Provisions**." Trial Court Opinion, 4/3/23, at 4 n.3 (emphasis added). For future reference, the aforementioned PFA form order states: "*Note:* Space is provided to allow for 1) the court's general findings of abuse; 2) inclusion of the terms under which the order was entered . . .; or 3) information that may be helpful to law enforcement." Final PFA Order, 12/22/23, at 19.

failed to present evidence to support her claim that S.P. suffered any bodily injury.  *See* Trial Court Opinion, 4/3/23, at 27.[6]

The final PFA order, which specifically superseded any prior child custody order, also included the additional, relevant provisions:

> AND NOW, on this 30th day of December 2022, the Court ORDERS and DECREES that the below additional provisions shall be incorporated into its [f]inal Protection from Abuse Order ([f]inal PFA Order) issued on December 30, 2022 as follows:
>
> *        *        *
>
> 3. The Court finds that the evidence submitted at the hearing on December 22, 2022[,] establishes that on or about April 13, 2022, Father committed acts that the [c]ourt finds constitute abuse under the Protection from Abuse Act, 23 Pa C.S.[A.] § 6101.
>
> 4. **The PFA Order and these Additional Provisions to Final P[.F.A. o]rder shall expire on June 30, 2023.**
>
> 5. The parties' custody order(s) in effect in CV 2018-005878 remain in effect except as modified by this December 30, 2022 PFA Order and these Additional Provisions to Final Protection from Abuse Order.
>
> 6. None of the provisions in this [o]rder and the [f]inal PFA [o]rder pertain to parties' other minor child, A.P.
>
> 7. Father's physical custody of minor child S[.]P[.,] as provided in the custody order(s) in effect in CV 2018-005878[,] is temporarily suspended during the pendency of the [f]inal PFA [o]rder as modified by this [o]rder.  Any legal custody provisions provided in CV 2018-005878 remain unchanged, except as modified by the [f]inal PFA [o]rder and the provisions in this [o]rder.

---

[6] Officer Hurwitz testified that he did not recall seeing any visible signs of injury on either Father or S.P. when he arrived on the scene.  *See* N.T. Final PFA Hearing, 12/22/23, at 178.

8. Father shall have no contact with [S.P.] while the [f]inal PFA [o]rder and this [o]rder remain in effect, except as follows:

a. Father shall be permitted one phone call to [S.P.] per week every Sunday evening for 5-10 minutes to occur between 6 p.m. and 7 p.m. Mother shall initiate this call and encourage [S.P.] to participate in this phone call.

b. Should [S.P.] not be available any Sunday evening for Father's call, the date and time of the phone call must be rescheduled immediately by mutual agreement between Mother and Father.

c. If not already accomplished, parties shall engage a therapist for [S.P.] within two (2) weeks of this [o]rder. [S,P.]'s therapy shall commence immediately and costs shall be split 50/50 between the parties.

d. Father shall not contact [S.P.]'s therapist except upon the therapist's request.

e. If deemed appropriate by [S.P.]'s therapist, Father shall be permitted to attend therapy sessions with [S.P.] either remotely or in-person, as recommended by the therapist.

f. Mother and Father shall immediately identify an additional therapist who will evaluate [S.P.] and Father for reunification therapy and commence such therapy if the reunification therapist deems it appropriate after consultation with [S.P.]'s therapist. Mother and Father shall sign all necessary authorizations to facilitate that consultation. Costs for the reunification therapist shall be split 50/50 by the parties.

g. Father shall be permitted to attend reunification therapy sessions with [S.P.] either remotely or in-person, as recommended by the therapist

9. This [o]rder supersedes this [c]ourt's [t]emporary P[FA o]rder issued April 14, 2022 and all subsequent modification to that [o]rder in the PFA Docket, 2022-80576.

Additional Provisions to Final PFA, 12/30/22, at 1-3 (emphasis added).

Father filed a timely notice of appeal on January 30, 3023.[7] He raises

the following issues for our consideration:

(1) Did the [t]rial [c]ourt abuse its discretion by finding that Mother provided sufficient evidence to meet her burden that Father "abused" the child within the meaning of 23 Pa.C.S.A. § 6102(a)(2)?

(2) Did the [t]rial [c]ourt commit an error of law or an abuse of discretion by failing to consider Mother's motives to subvert the custody order by filing a Petition for Protection from Abuse?

(3) Did the trial court commit an error of law or an abuse of discretion in making a finding of abuse when this incident involved custody issues rather than an act of abuse?

Appellant's Brief, at 2.

Father first contends that there was insufficient "credible" evidence to

prove, by a preponderance of the evidence, that he placed S.P. in "reasonable

fear of imminent serious bodily injury" to support the PFA order. Specifically,

Father claims that "[w]hile the events of April 13, 2022, may have been

upsetting to all involved, Father acted as a responsible parent and was in no

way 'abusive' to S.P." *Id.* at 17.

> When a claim is presented on appeal that the evidence is not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the [prevailing party below] and[,] granting her the benefit of all reasonable

---

[7] Although Father's Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal did not initially reflect that it had been filed, Father's counsel explained that the statement was not docketed "due to an issue in the Delaware County Office of Judicial Support." *See* Response to Rule to Show Cause, 3/15/23. However, counsel thereafter attached a copy of a revised trial court docket showing that the statement was, in fact, filed timely with the trial court.

inference[s], determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it. Furthermore, the preponderance of the evidence is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence.

*Thompson v. Thompson*, 963 A.2d 474, 477 (Pa. Super. 2008) (quotations and citations omitted). The intent of the alleged abuser is of no moment when determining whether the victim was in reasonable fear of imminent serious bodily injury. *Raker v. Raker*, 847 A.2d 720, 725 (Pa. Super. 2004). In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion. *Burke ex rel. Burke v. Bauman*, 814 A.2d 206, 208 (Pa. Super. 2002).

The PFA Act (Act), defines abuse, in part, as "[**p**]**lacing another in reasonable fear of imminent serious bodily injury**[.]" 23 Pa. C.S.A. §§ 6102(a)(2) (emphasis added). The Act authorizes the court to enter protective orders directing a defendant from abusing a petitioner or minor children. *See id.* at § 6108(a). Accordingly, a PFA plaintiff may have a defendant excluded from her household by court order or may be awarded temporary custody of the parties' minor children. *Id.* A court may also order a PFA defendant to refrain from any contact with a petitioner or minor children. *Id.*

At the PFA hearing, Mother[8] testified that on April 13, 2022, while she was on the phone with Children who were at Father's house, "[S.P.] told [Mother] of an incident that had happened at dinner where [F]ather had yelled at [S.P.] and had punished her, and she had gone to her room at that time after having her telephone and tablet taken away as punishment for her crime[.]" N.T. PFA Hearing, 12/22/22, at 19. Mother then testified that she "spoke to [S.P.] and calmed her down, because she was very upset. And then [S.P.] - - handed the phone to [A.P.] and [as Mother] was speaking to [A.P.] . . . he reiterated the story of what occurred at dinner . . . and then he put [Mother] on a video call." *Id.* at 22-23. As Mother was on the video call with A.P., Mother testified she could hear "[S.P.] and [F]ather [and F]ather was yelling in the background at her, and [S.P.] loudly sa[id] back to him 'no, no.' And then [S.P.] came in the bathroom and shut the door behind her, and [then A.P. and S.P.] were both on the video call with [Mother] at that time." *Id.* at 24.

Mother testified that Father "had told [S.P.] that she wasn't allowed to speak to [Mother] anymore." *Id.* at 25. Mother testified that when Children opened the bathroom door, Mother saw Father and Paternal Grandmother on the other side of the door videotaping and recording Mother's phone call with Children. *Id.* at 27. At that point, Father and Paternal Grandmother followed

---

[8] Mother stated on the stand that "we are here . . . because [Father] and his mother physically attacked [S.P.], causing her bodily harm, and making her scared to be in their presence and in his home." N.T. Final PFA Hearing, 12/22/23, at 91.

S.P. into her bedroom, insisting that S.P. hang up with Mother and give them her phone. *Id.* at 29. Father then took S.P.'s sketchbook and diary from S.P.'s bedroom. Mother then testified:

> I could see in the video [on the Facetime call] that [Father and Paternal Grandmother] backed [S.P.] into a corner back behind her bed, and the moment that they both jumped on her and everybody hit the floor. You could see it in the video that[—]you could hear the altercation, the tussling, and you could see them the moment that[—]the impact when they hit her and they all fell to the floor in the video.
>
> * * *
>
> They were taking the phone from [S.P.]. You could hear them grabbing her.
>
> * * *
>
> They rushed her with their bodies, backed her into a corner.
>
> * * *
>
> And then physically grabbed her . . . [on her arms and her hands], dragging her down.
>
> * * *

And then physically with his body [Father] knocked [S.P.] down. *Id.* at 32-35. At Father's direction, Paternal Grandmother then turned off the video portion of the call with Mother, *id.* at 37, but Mother testified that she could still hear S.P. "screaming and crying." *Id.* at 38.

Mother did not see A.P. in the Facetime video during or after the altercation. *Id.* at 40. When the phone disconnected, Mother asked her fiancé

to call 9-1-1. *Id.* While Mother was on the phone with 9-1-1, she and her fiancé drove to Father's house. *Id.* at 41. During the drive, S.P. called Mother and told her that she had gone across the street to J.S.'s house. *Id.* at 42. Police officers arrived on the scene, going to Father's and J.S.'s houses, where they spoke to Mother, S.P., Mother's fiancé, J.S., and Father about what had occurred. *Id.* at 43-44.

After speaking to the police officers, S.P. went home to Mother's Wallingford home, where she was "hysterically upset, shaking, crying terrified." *Id.* at 47. *See id.* at 48 (Mother describing S.P.'s state of mind as "terrified" when they got home that evening). S.P. told Mother that her hands and arms hurt from the altercations, *id.* at 47, showed Mother scratches on her limbs, blood on the inside of her fingers, bruises on the outside of her hands, and a red mark on the inside of her arm. *Id.* Finally, Mother testified that S.P. was so upset and scared that evening that she had to sit with her and lay with S.P. on the couch, where S.P. "wrapped her body basically around [Mother's] and held Mother to help her fall asleep." *Id*. at 48. Mother testified that S.P. woke up after a couple hours of sleeping "and [they] went basically through the whole thing again . . . [s]he just couldn't let go." *Id.* at 40.

Mother testified that Father had abused S.P. in 2018 by "standing over [S.P.] aggressively when she . . . tried to step in when Father was being abusive to [Mother]. [H]e backed [S.P.] up against the wall and stood over her [] . . . screaming at her." *Id.* at 52. Mother also testified that around the same time Father "took the entire sofa that [Mother and S.P.] were sitting on

and shoved it all the way across the living room with them on it[,] which was very scary[.]" *Id.* at 52-53. *Id.* at 54 (Mother testifying she and S.P. "were very afraid of him" when he shoved the sofa). Finally, Mother testified that Father's stature is much larger than S.P., who stands at only 5'3½" and weighs 110 pounds. On the other hand, Father, a former Special Operations Medic in the Army, is 5'8" and weighed approximately 180 pounds at the time of the incident. *Id.* at 208-09.

The trial judge conducted the questioning of S.P. at the final PFA hearing. S.P. testified that Father took her phone and tablet away from her at dinner because she "didn't want to be there . . . because [Father] was abusive, and because [she] just di[dn't] want to be there,[9] and [Father] didn't listen to [her]." *Id.* at 148-49. S.P. testified that later in the evening, she went to her room to hide and "sat against the door and [Father] was trying to get in." *Id.* at 151. Specifically, S.P. testified that Father "kept trying to get in[to her room], . . . saying 'open the door,' [and] he ended up pushing against the door and it kept hitting [S.P.'s] head [and she] got scratches on

---

[9] Mother testified at the *ex parte* hearing in April 2022 that she and Father had modified their custody schedule "for makeup time because [Mother's] grandmother had passed away and [she and the Children] had to leave town for the funeral." N.T. *Ex Parte* Hearing, 4/14/22, at 5. As a result, S.P. was upset that she had to spend her entire spring break at Father's home to make up for the lost custody time with Father.

[her] finger [] from the door." **Id.** at 151-52. At some point thereafter, S.P. got her phone back[10] and Facetimed with Mother.

S.P. testified that Father and Paternal Grandmother "cornered [her] in [her] room to get [her cell]phone, and [she] jumped on the bed to try to keep it from them . . . and they kept cornering [her] and they reached for the phone, grabbing for it, grabbing me for it." **Id.** at 156. S.P. then said that during the fray, she "accidentally" broke Father's glasses and that "is when [Paternal Grandmother] started yelling to get[—]call the police on me, which I started freaking out, because I was scared[—]of what they'd do." **Id.** S.P. then testified that she followed Father into the living room, after Father had successfully recovered the phone from S.P. in her bedroom. In the living room, Father gave S.P.'s phone to Paternal Grandmother and told her to turn it off. **Id.** at 157. S.P. said that Father and Paternal Grandmother "kept acting like [S.P.] was going to hurt [Father and] kept saying[, ']you can't touch [Father']." **Id.** S.P. also testified that while they were in the living room Father "kept standing . . . intimidatingly." **Id.** at 157.

S.P. also stated that Father "tackled" her in the living room and the bedroom when they were vying for S.P.'s phone, **id.** at 158, and that "[Father and Paternal Grandmother] held [her] back" in the living room. **Id.** ("They were just, like, grabbing my arm and holding me back."); **id.** at 160 ("I just remember he held my arms back."). S.P. testified that, while this was

---

[10] S.P. could not recall how she got her phone back from Father. **See** N.T. PFA Hearing, 12/22/22, at 154.

occurring, she "was really scared." *Id.* S.P. was ultimately able to "g[e]t out of restraint . . . ran to [her] room[,] grabbed [her] coat and [her] shoes, and [] tried to leave[,] but [Paternal Grandmother] blocked the [front] door." *Id.* at 162. S.P. testified that Paternal Grandmother kept "telling [A.P.] that they were going to send [S.P.] away, and that [S.P. would] never see anyone again." *Id.* At that point, S.P. "ran out the back door . . . across the street to . . . [J.S.'s house]" where she called Mother. *Id.* S.P. testified that after speaking to police officers at the neighbor's home, she went home with Mother and "was sick for the rest of the night because [she] was upset [and] didn't want to go back to [Father's house because she] was scared of what they would do." *Id.* at 163-64.

When the trial judge asked S.P. if it was the first time that something like this happened with Father, S.P. testified "[t]here's been plenty of arguments with him and things, but they never got this crazy [and she'd] never felt like [she] had to run away for [her] safety before." *Id.* at 164. However, when asked whether prior fights between S.P. and Father had gotten physical, S.P. testified, "What scared[—]what made me run away was that they were going to call the police and say[—]but stuff like this had happened before where they had tackled me. Or they punished me a lot for saying that I was unhappy." *Id.* at 164-65.

Later, when the trial judge asked if there were any other reasons why S.P. did not want to be at Father's house, she stated:

- 14 -

> [He]'s abusive . . . [h]e does not care what we think, and he manipulates everything.  And he threatens us a lot.
>
> He threatened us by saying that he'll[—]like he'll punish us and hit us, and that he'll not let us see our mom again.  And I was always scared that he'd hurt us.

*Id.* at 165-66.  S.P. then stated that Father physically hurt her that night and that in the past he had hurt A.P. by spanking him, sometimes with a belt.  *Id.* at 166.  Finally, S.P. testified that she is afraid of Father "[b]ecause she do[es]n't know what he'll do." *Id.* at 166-67; *id.* at 167 ("He might hurt me again, all the stuff he says and [the] threats.").

J.S., Father's neighbor, testified that on the date in question, S.P. came to her home on the evening of April 13, 2022, and "was at her door crying, and scared to death." *Id.* at 124.  *See id.* at 125 (J.S. testifying S.P. was "basically hysterical and afraid" when she came to her house after the incident with Father in April 2022).  J.S. testified that Mother arrived at her house approximately five to six minutes after S.P. appeared on her doorstep. *Id.* at 127.  When S.P. left to go home with Mother, J.S. testified that S.P. was still "like a nervous wreck . . . basically scared to death . . . still kind of scared to death of what was going on." *Id.* at 128-29.  *See id.* at 132 (J.S. testifying S.P. came over to her house because **"[s]he was in fear** . . . coming from her father's house") (emphasis added).

Father testified that he never put his hands on S.P. during the ordeal on April 13, 2022. *Id.* at 212.  He testified that after a fight at the kitchen table, S.P. refused to comply with his request to give him her phone and, as Father tried to "grab[] it from her [and] started walking away[, s]he started hitting

[him] in the back." **Id.** at 205. Father continued that while in S.P.'s bedroom, S.P. hit him "[w]ith her fists on [his upper] back[, and] jump[ed] onto [his] back trying to reach for the phone [a]s [he was] trying to walk out the [bedroom] door." **Id.** at 206. Father then testified that S.P. grabbed his glasses and started to "bend them in half," and "proceed[ed] to follow and scream at [him and Paternal Grandmother as they went into the living room]." **Id.** At that point, Father testified he decided to call the police, **id.**, causing S.P. to leave the house and go to J.S.'s home. **Id.** at 206-07.

Viewing the evidence in the light most favorable to Mother, the prevailing party, we conclude that Mother proved, by a preponderance of the evidence, that S.P. was in reasonable fear of imminent serious bodily injury following the events that occurred at Father's home on April 13, 2022. **Raker**, **supra**. S.P. testified at the ex parte hearing and final PFA hearing that Father and Paternal Grandmother "cornered" her in her bedroom where they were "grabbing" her, "tackled" her, and held her arms back in an effort to prevent her from using her phone to talk to Mother, while threatening to call the police and telling S.P. that she would never see Mother again. Testimony established that S.P. was "screaming and crying" and was "scared to death of what was going on" at Father's house. S.P. remained traumatized by Father's actions well into the early morning hours, being unable to fall asleep and causing her to wake several times during the night in Mother's care.

Although Father contends that he "made no attempt to injure S.P." and that "[a]ny physical action taken by Father that evening was solely to retrieve

and retain S.P.'s phone as a form of punishment," Father's intent is of no moment when determining whether S.P. reasonably feared imminent serious bodily injury. **Raker**, **supra**.

Additionally, Father's claim that S.P. was not telling the truth regarding her version of events, in particular Father's physicality towards her on the evening in question, does not change our resolution of his issue on appeal. **See** N.T. Final PFA Hearing, 12/22/22, at 214-18 (Father testifying S.P. not telling truth regarding: being "cornered" in bedroom while he tried to retrieve her phone; being told by Father and Paternal Grandmother that they were going to have her arrested and taken away; suffering bruises due to Father attacking her that evening; and Father having threatened her in the past). As we have stated, matters of credibility and weight of testimony are for the trial court, not this Court, to determine. **See K.B. v. Tinsley**, 208 A.3d 123, 129 (Pa. Super. 2019); **see also Coda v. Coda**, 666 A.2d 741, 743 (Pa. Super. 1995) (it is trial court's duty to assess credibility of witnesses; we are bound by trial court's findings if supported by competent evidence). The trial court was tasked with the responsibility of resolving any conflicting testimony between the parties.[11] **E.K. v. J.R.A.**, 237 A.3d 509 (Pa. Super. 2020). Here, The Honorable Stephanie Klein found S.P. "intelligent and articulate [and] determined [S.P.'s] testimony that Father had terrified her that evening to be

---

[11] Notably, S.P. confirmed the facts that she called Father a jerk, poured water into the meat bowl and then poured it on the table, hid in her room, and broke Father's glasses on the evening in question. **See** N.T. *Ex Parte* Hearing, 4/14/22, at 12-13.

credible for several reasons." Trial Court Opinion, 4/3/23, at 16 (listing reasons why trial court found S.P.'s testimony credible).

Accordingly, we conclude that that the trial court did not abuse its discretion by finding that S.P. "had a reasonable fear of imminent serious bodily injury," and entering a final PFA against Father. ***Thompson***, ***supra***.

Father next contends that Mother used the PFA Act to "subvert" the parties' custody order and that the instant situation is really an "incident involv[ing] custody issues rather than an act of abuse." Appellant' Brief, at 28. As we have already concluded, Mother proved by a preponderance of the evidence that Father's actions on April 13, 2022, constituted "abuse" as defined by the PFA Act. "Custody wise, an order under the P[FA] Act . . . is not designed to impose anything but emergency relief."[12] ***Dye for McCoy v. McCoy***, 621 A.2d 144, 145 (Pa. Super. 1993). Moreover, nothing in the PFA Act prevents a party from filing a custody petition or from altering a pre-existing custody order to eliminate conflict.[13] ***Id.*** "To hold otherwise would have the effect of emasculating the central and extraordinary feature of the PFA [Act] which is to prospectively control and prevent domestic violence." ***Id.***

---

[12] In fact, as acknowledged ***supra*** at n.3, the final PFA is no longer in effect.

[13] Indeed, the trial court carefully crafted additional provisions to account for the parties' custody order in effect at the time the final PFA order was issued. ***See supra*** at 5-6.

To the extent that Father argues this case involves "custody issues," we note that the parties' custody matter is not part of the certified record on appeal. Therefore, we may not consider any such issues on appeal. **See Commonwealth v. Velez**, 477 A.2d 879 (Pa. Super. 1984). In any event, as we noted earlier, even in cases where there is a pre-existing custody order, a court may award temporary custody of parties' minor children to a PFA plaintiff and may also order a PFA defendant to refrain from any contact with a PFA petitioner or minor children. **See** 23 Pa.C.S.A. § 6108(a).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/19/2023