J-A13024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SAMANTHA WHIPKEY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| NICHOLAS WOYTON | : | |
| | : | |
| Appellant | : | No. 1451 WDA 2024 |

Appeal from the Order Dated October 30, 2024
In the Court of Common Pleas of Armstrong County Civil Division at
No(s):  No. 2024-1389-Civil

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED:  June 24, 2025**

Appellant, Nicholas Woyton, appeals from the final Protection From Abuse ("PFA") order, which was entered on October 30, 2024.  We affirm.

On October 16, 2024, Samantha Whipkey ("Plaintiff") filed a petition for a temporary PFA order against Appellant.  The trial court granted Plaintiff's petition that day and scheduled a hearing for October 30, 2024.  *See* 23 Pa.C.S.A. § 6107(a).

During the October 30, 2024 hearing, Plaintiff testified that Appellant is her former boyfriend and the biological father of her nine-year-old son, C.W. N.T. Hearing, 10/30/24, at 4 and 14-15.  Appellant's parental rights to C.W. were, however, involuntarily terminated by order of court entered on June 24,

2020.[1]  ***See In re Adoption of C.N.W.***, 248 A.3d 516 (Pa. Super. 2021) (non-precedential decision).

As Plaintiff testified, at 7:03 on the morning of October 15, 2024, she heard someone yelling outside of her kitchen window.  N.T. Hearing, 10/30/24, at 5.  According to Plaintiff, she walked to her back window and saw Appellant, "knocking at the back door," and "yelling" the following:  "you have [C.W.] illegally;" "let [C.W.] see his dad;" and, "I'm going to take [C.W.]" ***Id.*** at 10-11.  Plaintiff also testified that Appellant was attempting to get C.W.'s attention by yelling "[C.W.], it's your dad." ***Id.*** at 11.

Plaintiff testified that Appellant was at her house that morning unannounced. ***See id.*** at 5.  Moreover, Plaintiff testified that Appellant knew he was not allowed in her back yard that morning, as it was protected by a gate and Plaintiff posted "private property, no trespassing" signs for the area. ***Id.*** at 8.

Plaintiff testified that Appellant's actions that morning scared her and she called 911.  However, while she was on the phone with 911, Appellant left "because he realized [Plaintiff] was actually on the phone with 911." ***Id.*** at 11-12.

---

[1] In 2020, Plaintiff voluntarily terminated her parental rights to C.W. ***See In re Adoption of C.N.W.***, 248 A.3d 516 (Pa. Super. 2021) (non-precedential decision), at 1 n.1.  Later, however, Plaintiff legally adopted C.W.  N.T. Hearing, 10/30/24, at 14.

As Plaintiff testified, she last talked to Appellant "about a year and a half" prior to the October 15, 2024 incident – and only did so because Appellant called her on the telephone. *Id.* Since that time, Plaintiff testified, Appellant has attempted to contact her through "calls, texts, Facebook Messenger," but Plaintiff has not answered any of these communications. *Id.*

Plaintiff testified that Appellant has been physically violent to her in the past, including holding her down and grabbing her. *Id.* at 13. Plaintiff also testified to an incident that occurred seven years prior, where Appellant "showed up at the house . . . and he was yelling, Samantha, Samantha, or something . . . and he wouldn't leave, so my dad pepper sprayed him. He fell off the porch." *Id.* Further, Plaintiff's sister testified that she remembered an incident where Plaintiff "asked me to come get her" from Appellant's mother's home. Plaintiff's sister testified: "[Plaintiff] got in my front seat and I was trying to put the window up . . . and [Appellant] was holding onto my car trying to hit [Plaintiff] through the window as I was trying to drive away." *Id.* at 20.

As Plaintiff testified, she is afraid of Appellant and is "trying to have no contact with him and just move on, but [Appellant is] not letting that happen." *Id.* at 15-16.

Appellant also testified during the hearing. According to Appellant he has never threatened physical violence against Plaintiff or her son and he has never harmed Plaintiff. *Id.* at 29-30. Further, Appellant testified that, on the morning of October 15, 2024, he was merely attempting to talk with Plaintiff.

- 3 -

*Id.* at 33. As he testified, on that morning: he was not being aggressive; he was simply "tapping" on the back door; and, he wanted a "peaceful" meeting with Plaintiff and her son. *Id.* at 33-35. Moreover, Appellant testified that he recently filed a custody complaint, seeking custody over C.W. *Id.* at 35. Appellant surmised that Plaintiff filed the current PFA action "as a tactic in the custody matter." *Id.*

On October 30, 2024, the trial court granted a final PFA order in favor of Plaintiff and against Appellant for a period of three years. Trial Court Order, 10/30/24, at 1. Appellant filed a timely notice of appeal. He raises three claims to this Court:

> 1. Did the trial court err in entering a final [PFA] order because [Plaintiff] failed to prove that [Appellant] abused her as defined under 23 Pa.C.S.A. § 6102(a)(1)-(5)?
>
> 2. Did the trial court err in entering a final [PFA] order against [Appellant] for the full statutory [term] of three years absent any evidence of abuse as defined under 23 Pa.C.S.A. § 6102(a)(1)-(5)?
>
> 3. Did the trial court abuse its discretion in failing to consider that the temporary and final [PFA] orders were in fact an abuse of the custody litigation process by [Plaintiff]?

Appellant's Brief at 4 (some capitalization omitted).

Appellant's first claim contends that the evidence was insufficient to support the final PFA order.

As we have explained:

> The PFA Act[, 23 Pa.C.S.A. §§ 6101-6122,] does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but

- 4 -

only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.

When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner[,] granting her the benefit of all reasonable inferences, [and] determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa. Super. 2020) (quotation marks, citations, and corrections omitted).

The PFA Act states that "[a]n adult or an emancipated minor may seek relief under this chapter . . . by filing a petition with the court alleging abuse by the defendant." 23 Pa.C.S.A. § 6106(a). "The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Id.* (quotation marks and citations omitted). As is relevant to the case at bar, the PFA Act defines the term "abuse" as follows:

The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

. . .

(2) Placing another in reasonable fear of imminent serious bodily injury.

. . .

- 5 -

> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. . . .

23 Pa.C.S.A. § 6102(a).

The PFA Act does not expressly define the phrase "course of conduct." *See* 23 Pa.C.S.A. § 6102. However, we have previously stated:

> "Course of conduct" is defined in multiple instances [] in the Crimes Code and, in each of those instances, "course of conduct" implies more than one act over time. *See* 18 Pa.C.S.A. § 2709(f) (defining "[c]ourse of conduct" as used in the statute defining the offense of harassment as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct"); 18 Pa.C.S.A. § 2709.1(f) (defining "[c]ourse of conduct" as used in the stalking statute as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct"). Although recognizing that the harassment and stalking statutes provide a statutory definition for the phrase, this Court has "explained that '[c]ourse of conduct by its very nature requires a showing of a repetitive pattern of behavior.'" *Commonwealth v. Leach*, 729 A.2d 608, 611 (Pa. Super. 1999) (*quoting* *Commonwealth v. Urrutia*, 653 A.2d 706, 710 (Pa. Super. 1995)).

*Commonwealth v. Kelly*, 102 A.3d 1025, 1030–1031 (Pa. Super. 2014); *see also* 23 Pa.C.S.A. § 6102(b) ("[t]erms not otherwise defined in [the PFA] chapter shall have the meaning given to them in 18 Pa.C.S. (relating to crimes and offenses)").

"[P]ast acts are significant in determining the reasonableness of a PFA petitioner's fear. As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for

the Act to apply." ***K.B. v. Tinsley***, 208 A.3d 123, 128 (Pa. Super. 2019) (quotation marks and citations omitted).

As the trial court thoroughly explained, the evidence was sufficient to support is final PFA order:

> The [trial] court found that [Appellant] committed abuse as defined in 23 Pa.C.S.A. § 6102(2), which provides that "[p]lacing another in reasonable fear of imminent serious bodily injury" constitutes abuse. . . . [T]he [trial] court also found that [Appellant] committed abuse under 23 Pa.C.S.A. § 6102(5), which provides, in pertinent part, that a person commits abuse by "[k]nowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury."
>
> In assessing whether [Plaintiff] was in reasonable fear of imminent serious bodily injury, the court considered past acts of abuse.
>
> [Plaintiff] and her sister both testified about several previous incidents between [Appellant and Plaintiff].
>
> - One time when [C.W.] was about two years old, [Appellant] showed up at [Plaintiff's] house and was yelling "Samantha, Samantha," and he would not leave; [Plaintiff's] father had to pepper-spray him. Another time he got on her, grabbed her, and held her down, mostly when they were still in a relationship.
>
> - When [Plaintiff] entered her sister's vehicle while [Plaintiff and Appellant] were still in a relationship, [Appellant] was holding onto the vehicle trying to hit [Plaintiff] through the window as her sister was trying to drive away.
>
> [Appellant] denied that these incidents occurred.
>
> Because of the PFA Act's protective goals, some flexibility is allowed in the admission of evidence relating to past acts of

abuse. Past abusive conduct on the defendant's part is a crucial inquiry for entry of a proper order. The court took these incidents into account when assessing whether [Plaintiff] had a reasonable fear of serious bodily injury on October 15, 2024.

Furthermore, [Plaintiff] testified that she last spoke with [Appellant] approximately a year and a half ago, and since then, he has tried to contact [Plaintiff] through phone calls, text messages and Facebook Messenger, asking to see [C.W.]; [Plaintiff] did not respond to his attempts to communicate with her. Then on October 15, 2024, [Appellant] out of the blue shows up at [Plaintiff's] house at 7:00 a.m. [Plaintiff] heard yelling through her kitchen window and realized it was [Appellant]. She thought he was in her kitchen, and she yelled at him to get out of her house. According to [Plaintiff], [Appellant] yelled at [Plaintiff] that she had [C.W.] illegally, to let him see his dad, and that he was going to take him. [Appellant] testified that he asked [Plaintiff] to open the door and talk to him, and that she had [C.W.] illegally. It was not until [Plaintiff] said she was calling the police that [Appellant] voluntarily left.

[Plaintiff's] security cameras captured images of [Appellant] walking through her front gate past a "no trespassing" sign, walking to the back of her house, knocking on her back door, then walking to her back window, all the while yelling at her that she had [C.W.] illegally and he was "going to take him."

[Appellant] testified that he has tried everything he could possibly do to see [C.W.]; he is seeking custody of [C.W.]; his biological father was trying to get custody of [C.W.]; he believes [C.W.] is still his son; when he went to [Plaintiff's] back window, he was hoping he could talk with her and work out custody, and he yelled at [Plaintiff] to open the door and talk to him; he still intends to proceed through the courts to seek custody; he thought it was in [C.W.'s] best interest to show up at [Plaintiff's] house unannounced and knock on the door because [C.W.] loves his father.

[Appellant] described his thought process as not knowing it was possible that [Plaintiff] had [C.W.], nothing was stopping him from going to [Plaintiff's home] and knocking on her door (at the urging of his girlfriend), and that maybe [Plaintiff]

would have some sense. [Appellant's] supposed intent to just talk to [Plaintiff] is irrelevant. In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury. Given at least three prior incidents ([Appellant] would not leave and had to be pepper-sprayed; [Appellant] got on her, grabbed her, and held her down; where [Appellant] attempted to hit [Plaintiff] through the window as her sister was trying to drive away), and the fact that [Appellant] showed up unannounced at [Plaintiff's] house out of the blue at 7:00 a.m., past a "no trespassing" sign and began demanding to see [C.W., Plaintiff] had every reason to believe that [Appellant] would inflict serious bodily injury upon her. At the very least, [Appellant's] repeated attempts over the years to contact her so that he could reunite with [C.W. – a child with whom Appellant has no parental rights – ]constitute a course of conduct that instilled in [Plaintiff] a reasonable fear of bodily injury when [Appellant] showed up at 7:00 a.m. demanding to see [and threatening to "take" C.W.] A "course of conduct" is a "pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct." [Plaintiff] testified that [Appellant's] shouting at her and her belief that [Appellant] was in her house scared her, and she is still scared; [C.W.] was also scared.

[Appellant's] choice of the self-help route to enforce nonexistent parental rights by engaging in a course of conduct over the years of harassing [Plaintiff], coupled with his conduct on October 15, 2024, provided ample reason for [Plaintiff] to believe that [Appellant] was capable of inflicting bodily injury or serious bodily injury upon her, and it was reasonable for [Plaintiff] to fear him.

Trial Court Opinion, 1/7/25, at 1-8 (footnotes omitted).

We agree with the trial court's cogent analysis and conclude that Appellant's first claim on appeal fails.

Next, Appellant claims that the trial court erred when it entered the PFA order against him "for the full statutory period of three years absent any evidence of abuse." Appellant's Brief at 23. As argued in Appellant's brief,

this claim attempts to relitigate the merits of Appellant's earlier sufficiency of the evidence claim. *See id.* at 23-24. As explained above, the evidence was sufficient to support the final PFA order. *See supra* at **4-9. Therefore, Appellant's second claim on appeal necessarily fails.

Finally, Appellant claims that the trial court abused its discretion when it "failed to consider that [Plaintiff's PFA petition was an attempt to] abuse [] the custody litigation process." Appellant's Brief at 25.

Appellant's final claim challenges the weight of the evidence. When considering a challenge to the weight of the evidence, our standard of review is well settled.

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa. Super. 2017) (quotation marks omitted). "[A]n abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the [trial] court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." *Commonwealth v. Loughman*, 314 A.3d 569, 572 (Pa. Super. 2024) (quotation marks and citations omitted).

The trial court rejected Appellant's weight claim because, it concluded, Plaintiff filed her PFA petition in good faith and was not attempting to abuse the custody litigation process. *See* Trial Court Opinion, 1/7/25, at 9. The trial court's credibility determination was within its discretion and Appellant's claim on appeal thus fails. *See K.B.*, 208 A.3d at 129 ("we defer to the trial court's credibility determinations, and we are not entitled to re-weigh the evidence").

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/24/2025