J-A16020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| HEIDI DAVILA, AND K.I., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VALENTIN GEORGE IONESCU | : | |
| | : | |
| Appellant | : | No. 2997 EDA 2024 |

Appeal from the Order Entered October 8, 2024
In the Court of Common Pleas of Northampton County Civil Division at
No(s):  C-48-PF-2023-00524

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KUNSELMAN, J.:          **FILED AUGUST 12, 2025**

Valentin George Ionescu appeals from the amended protection from abuse (PFA) order entered against him and naming his son K.I. as a protected party.  The parties are parents of three sons: D.I., born 2008, J.I., born 2011, and K.I., born 2013.  We find that the evidence was sufficient to prove that Ionescu abused K.I., Ionescu was afforded due process, and the trial court properly considered the weight of Ionescu's presentation.  However, because the amended order is set to expire later than the original, three-year order, we remand for the trial court to enter an amended order that expires no later than August 7, 2027.  Ionescu remains subject to an active PFA order.

On June 7, 2023, Heidi Davila filed a petition seeking protection for K.I. based on an incident on Friday, June 2, 2023.  Davila alleged that at approximately 5:50 p.m. that day, Ionescu hit K.I.  She described:

the children arrived at Forks Community Center . . . with [Ionescu] for their surprise.  [Ionescu] and his "wife" were going to teach a dancing class.  The children got upset about this news and refused to get out of the car.  [Ionescu] proceeded to yank [K.I.] out of the car, cursing at him in Romanian.  [Ionescu] walked to the other side to [get] the other child out of the car, that is when [K.I.] went back to the car and closed the door.  [Next, Ionescu] aggressively walked to [K.I.'s] door and flung it open.  When [K.I.] saw him approach he immediately assumed a defensive position on his back and blocking his face.  Then [Ionescu] struck [K.I.] on his face on the side of his nose and it was a quick and powerful hit, with [Ionescu] swinging like he was going to slap [K.I.], but closing his hand into a fist right as he was going to land the blow, [K.I.'s] nose was bleeding and his arms were soaked in blood.  His brother [D.I.] took [K.I.] inside the community center.  When they entered the lobby [Ionescu] asked what had happened - did you fall or if he was okay, acting like he didn't know what had happened or what he had done.  [D.I.] helped [K.I.] to clean off the blood.  [D.I.] found a way to get away from [Ionescu] and went to the front desk to call [Davila] at around 6:00 p.m.

Petition, 6/7/23, at 1–2.

The case proceeded to a hearing on August 7, 2024.  Prior to testimony, Davila's counsel informed the trial court of two legal matters that involved Ionescu, over Ionescu's objections.  First, counsel reported that Ionescu was convicted in a jury trial based on the same June 2, 2023, incident.  Second, she stated that in a custody action, Ionescu represented through counsel that he was not the children's biological father.  In support of the second assertion, the trial court read a transcript excerpt into the record.

Davila's first witness was K.I., who was ten years old at the time of the hearing.  K.I. described how Ionescu hit him in the nose on June 2, 2023.  The trial court, throughout K.I.'s testimony, responded to K.I. using favorable terms.

- 2 -

[K.I.:] So, [Ionescu] had custody of us that day, so he was driving. And we thought we were going to his house but, we were actually going [to] Forks Park because he had dance class at the Community Center. And we didn't know that. And we didn't want to go there, so when he like, parked -- we didn't want to get out. And he said, Get out, Get out.

And we don't want to, so we didn't get out. So then, he gets out and he opened my door. He pulls me out. He closed my door, and then he walked around the car and goes to my brother[ D.I.]'s side, which is the other side of the car. And then he opens that door, and then I opened my door and I go back inside of the car.

So, he looks mad. And he like, comes back to my side. And that's when he hit me. And I was like trying to cover my face, like this.

THE COURT: And for the record, this very brave and very awesome witness just held up both hands and covered his face with his both hands, fingers spread wide, palms facing in towards his face.

Keep telling me what's going on here.

[K.I.]: And then he hits me.

N.T., 8/7/24, at 24–25. K.I. testified that Ionescu hit him on the nose with a closed fist, and then Ionescu "just walk[ed] away" into the Community Center. *Id.* at 25. Meanwhile, K.I.'s nose started "bleeding a lot. Like, the worst it ever has." *Id.* K.I. testified that D.I. helped him contain the blood and went inside the Community Center with him. *Id.* at 25–26. He said that inside, Ionescu and his wife (Yvonne) asked, "What happened? Did you trip? Did you fall?" *Id.* at 26. K.I. recalled that he went into the bathroom with D.I. to clean up; he pushed away Yvonne because he didn't want her help. *Id.* at 26–27. Ionescu did not help K.I. *Id.* at 27. K.I. stated (over objection) that he wanted a protection order and no contact with Ionescu. *Id.* at 29–33.

Next, Davila presented the testimony of D.I., K.I.'s 15-year-old brother. D.I. corroborated K.I.'s account and said that, from the back seat of the car, he saw Ionescu "punch [K.I.] in the face" with a closed fist. *Id.* at 39. As a result, K.I. "was bleeding from his nose. A lot. . . . [I]t's kind of just gushing out of his nose. It's a lot of blood." *Id.* Inside the Community Center, when Ionescu asked what happened, D.I. "questioned him like, You know what happened," yet Ionescu "pretended he didn't know." *Id.* at 40. D.I. testified that he was afraid of Ionescu; he also wanted a three-year order prohibiting Ionescu from any contact with him. *Id.* at 42–43.

On cross-examination, D.I. acknowledged that he and K.I. refused to go inside the Community Center to the salsa dance class with Ionescu. *Id.* at 46–48.

Ionescu testified on his own behalf. He stated that the children were properly in his custody on June 2, 2023. *Id.* at 50. He provided that K.I. takes an allergy medication that causes nosebleeds. *Id.* at 53–54. Ionescu testified that he picked up K.I. and D.I. that day, which was middle son J.I.'s birthday. *Id.* at 64–65. The dance class was intended to be a surprise for J.I., whom Ionescu was supposed to pick up later that evening. *Id.* at 65. Ionescu testified that he parked, picked up shoes from the trunk, and walked inside the Community Center with Yvonne. *Id.* After he was inside, said Ionescu, K.I. and D.I. entered the building; K.I. "had a big bleeding nose." *Id.* Yvonne offered and helped K.I. clean his nose, and the children refused

to participate in the dance class. *Id.* Ionescu denied that he hit his child. *Id.* at 67.

After hearing argument, the trial court described its reasoning on the record. The court stated to Ionescu, "I find you to be totally and completely and entirely uncredible. And I find you to be a liar, and I find you to be a child abuser." *Id.* at 75.

The trial court granted a final PFA order, naming K.I., D.I., and J.I. as protected persons. The order included an expiration date of August 7, 2027, three years after the effective date. It awarded temporary custody of the three children to Davila, providing that any valid custody order entered after the final PFA order would supersede the custody provisions of the PFA order.

On August 16, 2024, Ionescu moved for reconsideration. The trial court granted reconsideration and on September 25, 2024, heard Ionescu's motion. The court entered an amended final PFA order, removing D.I. and J.I. as protected persons. Like the previous final PFA order, the amended final PFA order protected K.I. and awarded temporary custody of all three children to Davila. The amended final PFA order included an expiration date of September 25, 2027.

Ionescu timely appealed. Ionescu and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

In his brief, Ionescu presents eight questions for review but divides his argument into four sections: the sufficiency of the evidence, Ionescu's due process rights, the trial court's consideration of Ionescu's presentation in his

defense, and the extent of the amended final PFA order. We address each in turn.

First, Ionescu challenges the sufficiency of the evidence to prove that he perpetrated "abuse" on June 2, 2023, as defined by the PFA Act. He argues that there was no evidence he caused significant "bodily injury" to K.I., merely temporary discomfort. Ionescu asserts that the evidence was inconsistent and did not support the trial court's finding of abuse. He observes that, despite the trial court stating that K.I. had "a severe bloody nose and facial bruising," there was no evidence that K.I. had a bruise. Ionescu argues that a bloody nose alone is insufficient evidence of bodily injury. He faults the trial court for relying on his criminal conviction to find that he abused K.I.

This Court reviews a PFA order to determine whether the trial court committed an error of law or abused its discretion. *E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa. Super. 2020). We evaluate a sufficiency challenge to determine whether the trial court could reasonably find abuse from the evidence at the PFA hearing. *Id.* For such a claim:

> [W]e review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*Id.* (quoting *K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa. Super. 2019)). It is "within the exclusive province of the trial court as the fact finder" in a PFA case to assess the credibility of witnesses and the weight to give their

testimony.  ***S.G. v. R.G.***, 233 A.3d 903, 907 (Pa. Super. 2020) (quoting ***S.W. v. S.F.***, 196 A.3d 224, 230 (Pa. Super. 2018)).  Even if the testimony from the PFA hearing is contradictory, this Court cannot and will not reweigh the evidence when we assess sufficiency.  ***K.B.***, 208 A.3d at 129 & n.4.

For a trial court to enter a protection order, it must find abuse as alleged in the PFA petition.  This finding does not require corroboration; if one witness testifies about conduct that meets the definition of abuse, the trial court can determine that the defendant committed abuse.  ***See E.K.***, 237 A.3d at 523 (citing ***Custer v. Cochran***, 933 A.2d 1050, 1058 (Pa. Super. 2007) (*en banc*)).  All relevant terms are defined by statute.  Under the PFA Act, "abuse" includes any of the following acts between family members:

> (1)  Attempting to cause or intentionally, knowingly or recklessly causing bodily injury [or] serious bodily injury . . . with or without a deadly weapon.
>
> (2)  Placing another in reasonable fear of imminent serious bodily injury. . . .
>
> (4)  Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

23 Pa.C.S. § 6102(a) (excerpt).  The Child Protective Services Law, in turn, defines child abuse to include intentionally, knowingly, or recklessly "Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act."  23 Pa.C.S. § 6303(b.1)(5).  That law recognizes that a parent can use "reasonable force" against his own child for certain purposes.  23 Pa.C.S. § 6304(d) (supervision, control, and discipline).

"Bodily injury," for PFA purposes, means "Impairment of physical condition or substantial pain." 18 Pa.C.S. § 2301; *see* 23 Pa.C.S. § 6102(b). When a person uses physical force on someone, a fact-finder can consider the circumstances surrounding the use of force to infer that the force caused substantial pain. *Commonwealth v. Duck*, 171 A.3d 830, 836 (Pa. Super. 2017) (citing *Commonwealth v. Smith*, 848 A.2d 973 (Pa. Super. 2004)).

Finally, "serious bodily injury" is bodily injury that "creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. For PFA sufficiency purposes, a petitioner is not required to introduce medical evidence of an injury. *Custer*, 933 A.2d at 1058.

We reject Ionescu's contention that a "mere nosebleed" always requires additional evidence of impairment or pain before a fact-finder can determine that the nosebleed constitutes "bodily injury." He cites a case involving a nosebleed in combination with other injuries.[1] *Commonwealth v. McGinity*, 328 A.3d 534 (Table), 2024 WL 4326547 (Pa. Super. 2024) (non-precedential decision). The victim in *McGinity* had a bruised eye and a welt on her thigh as well as a nosebleed; this evidence was sufficient to establish that she had suffered bodily injury. That case, however, did not hold that a nosebleed alone would not constitute a bodily injury.

_____

[1] Ionescu invokes both *Commonwealth v. McGinity* and *Commonwealth v. Wertz* without providing a citation to a legal reporter or any other source of information about the cases. A thorough search has not revealed any case captioned *Commonwealth v. Wertz* with any bearing on Ionescu's issue.

- 8 -

To the contrary, in a recent case, this Court found the evidence sufficient to establish physical abuse by "bodily injury" where a parent punched her daughter in the face, causing a bloody nose. ***Interest of T.F.***, 317 A.3d 590 (Table), 2024 WL 1091704, at *8 (Pa. Super. 2024) (non-precedential decision). The trial court in that case could infer that the parent caused her daughter "substantial pain" from the act of striking her across the face. ***Id.***

Here, K.I.'s and D.I.'s testimony provided ample evidence for the trial court to find that Ionescu abused K.I., as defined by the PFA law. Both witnesses testified that Ionescu hit K.I. in the nose with a closed fist, causing an extensive nosebleed. Like ***T.F.***, the act of a parent striking a child in the face supports the finding that the hit caused "substantial pain" and that the resulting nosebleed was a "bodily injury." The evidence was therefore sufficient to establish that Ionescu intentionally caused bodily injury to K.I., constituting abuse under 23 Pa.C.S. § 6102(a), definition (1) of "abuse."

The evidence was also sufficient for the trial court to find abuse under definitions (2) and (4). The trial court could find from K.I.'s defensive position, which D.I. observed as Ionescu was about to hit K.I., that Ionescu placed K.I. in reasonable fear of imminent serious bodily injury. The trial court could find that Ionescu—who knew K.I. was prone to nosebleeds—physically abused his nine-year-old son by hitting his nose and creating a likelihood of bodily injury.

Furthermore, the trial court could reasonably find that Ionescu's actions toward his own child were not "reasonable force" for supervision, control, or discipline. At the PFA hearing, Ionescu denied that he ever hit his son. Both

K.I. and D.I. testified that when Ionescu saw K.I. enter the Community Center, Ionescu asked what had happened, as if he did not know. This behavior would be unwarranted from a parent who just used reasonable force to physically control his child.

We note that Ionescu is correct that the evidence from the PFA hearing did not support two of the trial court's findings: that K.I. had facial bruising and that J.I. was present at the time of the incident. However, neither were required to support the trial court's finding that Ionescu perpetrated abuse against K.I.; the trial court further removed the other children as protected parties on reconsideration. Likewise, the trial court had sufficient evidence to find Ionescu hit K.I. even without Ionescu's criminal convictions for the same conduct.

Because the evidence was sufficient to support the trial court's finding of abuse, Ionescu's first issue fails.

Second, Ionescu argues the trial court violated his due process rights. He claims the trial court disregarded his evidence about K.I.'s nosebleeds and Davila's potential motives in litigating the action. Ionescu alleges that the trial court was biased against him, denying his opportunity to present a defense and culminating in calling him a "liar" and "child abuser." Ionescu criticizes the trial court's finding that K.I. was credible, in light of (unspecified) inconsistencies in K.I.'s and D.I.'s testimonies. He concludes that the due process violation resulted in an erroneous finding of abuse.

We reject Ionescu's due process claim. Ionescu received due process because the trial court held a PFA hearing where Ionescu could present a defense and cross-examine the plaintiff's witnesses. *See D.H. v. B.O.*, 734 A.2d 409, 410 (Pa. Super. 1999). Although the trial court sustained several objections to Ionescu's presentation, these rulings were within the trial court's discretion based on the rules of evidence. Notably, the evidence that Ionescu wished to introduce about Children and Youth investigations, as well as other evidence of Davila's motives, constituted hearsay. The trial court acted within its discretion in assessing the evidence and determining credibility, which is its exclusive province as fact-finder. *S.G.*, 233 A.3d at 907. The trial court then bluntly explained its credibility determination to Ionescu: "I find you to be a liar, and I find you to be a child abuser." N.T., 8/7/24, at 75. Ionescu's challenge is to the outcome of the PFA hearing, rather than the process he received. Because Ionescu received due process, his second issue fails.

Third, Ionescu protests the trial court's failure to consider and assess "the broader family context." He challenges the final PFA order based on the trial court's failure to accept his evidence of Davila's history of alienation of the children, violations of custody, and adverse motives in filing the petition.

As Ionescu recognizes, the trial court listened to him present evidence and argument about the context of the PFA action. The trial court also observed K.I. and D.I. testify that Ionescu struck K.I. and gave him a nosebleed. It was within the trial court's discretion to determine whether abuse occurred and whether it was appropriate to enter a PFA order. *See*

**S.G.**, 233 A.3d at 907. This Court will not usurp the trial court's role. Ionescu's third issue fails.

Fourth, Ionescu challenges the PFA order as being excessive and disproportionate. He argues it improperly restricts his parental rights "due to the inclusion of the Plaintiff as a protected person." He challenges the award of temporary custody of all three children and the duration of the final order.

Initially, we observe that Davila petitioned for protection only as a parent of K.I., not on her own behalf. **See** 23 Pa.C.S. § 6106(a) (providing that a parent may seek relief on behalf of minor children). Although Davila is listed as the plaintiff on the orders that were entered in this case, she was not included as a protected person.

As to custody, the trial court recognized that the amended (current) order awarded temporary custody of all three children despite including only K.I. as a protected party. This was permissible; a trial court has authority to award temporary custody of a child even if that child was not abused. **C.H.L. v. W.D.L.**, 214 A.3d 1272, 1282 (Pa. Super. 2019) (citing 23 Pa.C.S. § 6108(a)(4)(iii)(B)). Notably, the PFA Act does not prevent the parties from further litigating custody. 23 Pa.C.S. § 6108(a)(4)(v). Here, as the trial court noted, "the parties have an open custody action in Northampton County . . . . [Ionescu] is not precluded from filing a petition for modification and having his position with regard to custody fully litigated." Trial Court Opinion, 12/23/24, at 3.

As to the duration of the PFA order, a trial court has discretion to grant relief up to the maximum time allowed. **Heard v. Heard**, 614 A.2d 255, 258–59 (Pa. Super. 1992); **see B.K.P. v. J.R.B.**, 303 A.3d 456, 462–63 (Pa. Super. 2023). Based on the facts of this action, we find that the trial court acted within its discretion by granting a final protection order for three years after the PFA hearing on August 7, 2024.

However, the law distinguishes between "amended" and "continued" orders entered after a final PFA order. Subsection 6108(d) of the PFA Act prescribes the maximum duration for a PFA order and allows for either party to petition to amend it. "A protection order . . . shall be for a fixed period of time not to exceed three years. The court may amend its order . . . at any time upon subsequent petition filed by either party." 23 Pa.C.S. § 6108(d). This three-year period "runs only from the date of the final order." **Holderman v. Hagner**, 760 A.2d 1189, 1194 (Pa. Super. 2000). The PFA Act separately provides for "extension" of an order. **See** 23 Pa.C.S. § 6108(e) (listing the requirements for the entry of an extended order).

Here, the trial court held a hearing and entered a final protection order on August 7, 2024. This order was set to expire on August 7, 2027. After the trial court heard Ionescu's motion for reconsideration, it entered an amended, final order on September 25, 2024, with an expiration date of September 25, 2027. Because the trial court did not find that any of the requirements for an extension were met, it could not extend the amended, final order beyond the statutory maximum from the date of the original, final order. We therefore

- 13 -

remand for the trial court to enter an amended order that expires no later than August 7, 2027.[2, 3]  Ionescu remains subject to an active protection order.

Case remanded for the entry of an order consistent with this memorandum.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/12/2025

---

[2] We direct the trial court to enter an amended order only after the record is remitted and jurisdiction is returned to the trial court.  **See Commonwealth v. Harris**, 230 A.3d 1124, 1127 (Pa. Super. 2020).

[3] We leave it to the trial court's discretion to determine whether to modify any other terms of the amended final order, such as temporary custody, based on developments in the parties' custody case.

- 14 -